COMMONWEALTH vs. WAYNE BLYTH HEALY.

Hampden. April 3, 1984. — November 28, 1984.

Present: HENNESSEY, C.J., LIACOS, NOLAN, & O'CONNOR, JJ.

*Homicide. Evidence,* Admissions and confessions, Photograph, Relevancy
and materiality, State of mind, Recent invention, Spontaneous utterance,
Impeachment of witness. *Constitutional Law,* Waiver of constitutional
rights. *Due Process of Law,* Prosecution's duty to obtain evidence. *Jury
and Jurors. Practice, Criminal,* Argument by prosecutor, New trial,
Deliberation of jurors.

The judge in a murder case did not err in denying the defendant's motion to
    suppress statements made by the defendant to police officers during
    interrogation at a police station despite the defendant's claims that he
    should have been given Miranda warnings as soon as he arrived at the
    station, but that he did not receive them until he had been booked, and
    that any waiver of his rights was invalid because of the coercive methods
    of interrogation used by the police. [373-375]
There was no merit to a claim made by the defendant in a murder case that his
    right to due process of law was violated by the prosecution's intentional
    or negligent failure to conduct certain tests on physical evidence intro-
    duced at trial and to follow up on certain investigatory leads. [375-376]
The judge at the trial of a murder case did not abuse his discretion in admitting
    in evidence photographs of the victim's body, taken at the scene, which
    showed his genitals, in admitting a photograph which showed the back
    of the victim's body and his bound hands, and in admitting a photograph,
    taken prior to the autopsy, showing the body with a probe inserted in
    one of the chest wounds. [376-377]
The record at the trial of a murder case did not support the defendant's con-
    tention that a T-shirt with the inscription, "Sex Instructor, First Lesson
    Free," belonging to the defendant, which had been excluded from evi-
    dence, was exhibited to the jury by the prosecutor. [377-378]
At the trial of a murder case there was no error in admitting in evidence a pair
    of under shorts taken from the top of the dresser in the victim's bedroom
    on which the Commonwealth's serologist found semen containing blood
    group substances consistent with the victim's blood group. [378]
At the trial of a murder case there was no error in the admission of certain
    testimony by the victim's girl friend tending to show that in the week
    before his death the defendant had formed a sexual attachment with
    someone other than his girl friend. [378-379]

At the trial of a murder case, there was no error in the admission of certain hearsay testimony by the assistant manager of a liquor store. [379-380]

At the trial of a murder case, no substantial risk of a miscarriage of justice was created by the admission of testimony by a police sergeant that, about a week before the murder, the sergeant had observed the defendant at the scene of a fire at the victim's apartment building, looking up, rather than toward the cellar, where the smoke was coming from [380-381]; nor was the defendant prejudiced by the fact that he first learned of this testimony during trial [381].

There was no merit to claims by the defendant in a murder case that he had been unfairly surprised by testimony by the Commonwealth's serologist that he had detected the presence of blood on the steering wheel of the defendant's automobile, and that this testimony should have been excluded for lack of relevance. [381-382]

The judge in a murder case properly denied the defendant's motion for a required finding of not guilty where circumstantial evidence at the trial was sufficient to enable the jury to conclude that the defendant was the person who had been in the victim's apartment on the night of the murder and who had killed the victim. [382-383]

The judge at the trial of a murder case did not err in excluding testimony of certain defense witnesses as to various exculpatory statements made by the defendant on the day following the murder. [383-385]

There was no reversible error at the trial of a murder case in the judge's refusal to allow the victim's insurance agent to testify that the victim's girl friend had called the agent twice in order to find out the identity of the beneficiary on a certain insurance policy held by the victim. [385]

No error appeared at the trial of a murder case in the prosecutor's reference during cross-examination of defense witnesses and in closing argument to the defendant's homosexuality and to homosexual overtones to the murder, where the defendant's homosexuality and his homosexual relationship with a defense witness had been established by evidence during the trial, and where a homosexual element to the victim's murder could be inferred from the evidence. [385-388]

A motion for a new trial of a murder case which was filed during the pendency of the defendant's appeal from his conviction was properly denied. [388-391]

Although the trial judge in a murder case had set a date for a further hearing, which was never held, after two lobby conferences concerning the possibility of extraneous influence on the jury's foreman, who had shared an apartment with a law student during the trial, a judge hearing the defendant's motion for a new trial properly concluded that no further evidentiary hearing was required, inasmuch as no extraneous influence on the foreman was apparent from the record. [391]

INDICTMENT found and returned in the Superior Court Department on September 11, 1980.

The case was tried before *Kent B. Smith, J.* A motion for a new trial was heard by *William W. Simons, J.*

*Barry P. Wilson (Linda H. Morton* with him) for the defendant.

*William T. Walsh, Jr.,* Assistant District Attorney, for the Commonwealth.

*Stephen Ansolabehere, Gary D. Buseck & Janice H. Platner,* for Gay & Lesbian Advocates & Defenders, Inc., amicus curiae, submitted a brief.

LIACOS, J. On April 8, 1981, a Hampden County jury found the defendant guilty of murder in the first degree. He was sentenced to the Massachusetts Correctional Institution at Walpole for the term of his natural life. On April 14, 1981, the defendant appealed from his conviction. On July 15, 1981, he filed a motion for a new trial, the subsequent denial of which he has also appealed. After the case had been entered in this court, the defendant filed a second motion for a new trial, together with other motions.[1] This court ordered that those motions be retained and determined by it in conjunction with the defendant's appeals. Having considered the "whole case" pursuant to G. L. c. 278, § 33E, we now deny those motions, and we affirm the conviction of murder in the first degree and the denial of his first motion for a new trial.

We begin by summarizing the evidence submitted by the Commonwealth. Between 1 and 1:30 A.M. on August 8, 1980, the victim, Richard Frank Chalue, was heard screaming for help from inside his apartment in Holyoke. Chalue's body was found on his bed shortly before 2 A.M. He had been stabbed fourteen times in the chest, once on either side of the neck, and once on his right thigh. There was also a laceration on his

---

[1] These were a motion for a stay of execution of sentence and for an order admitting the defendant to bail, a motion for permission to interrogate jurors and witnesses, and a motion to disqualify from further hearings the judge who denied the first motion for new trial. During this time, trial counsel also filed a motion to withdraw his appearance. Appellate counsel was not trial counsel.

left index finger. His hands had been bound behind him with socks tied together, and he had a gag of socks tied around his mouth. He was naked except for a towel wrapped around his neck and a pair of dungarees half-way down his legs. A pair of boots tied together with socks lay on the floor at the foot of the bed. On the table in the kitchen were a partially empty bottle of rum, two bottles of cola, one of which was partially empty, a glass, and an ashtray containing cigarette butts. The apartment was dark, since there was no electricity as a result of a fire in the building the week before. The victim's Doberman pinscher dog was locked in another room of the apartment. Both the front and the back doors were locked, the front door having been locked with a key from the outside.

Since the fire, the victim had been staying alone in the apartment, with the dog guarding his possessions. His girl friend and her two children, with whom he had shared the apartment for the last three years, were staying with her mother in her mother's apartment in a neighboring building. The victim, his girl friend, and the children were to have moved to a new apartment on August 8. On the evening of August 7, the victim had supper with his girl friend and the children in her mother's apartment and then took the children to a park. They returned at about 7:30 P.M., and he left at about 8:20 P.M. At about 9:15 P.M. his girl friend telephoned Chalue's apartment. There was no answer. She called back twice in rapid succession. Chalue answered the third time, sounding as though he had been running and was out of breath. He said that he had been downstairs at the apartment of a neighbor. Then she heard someone walk into the kitchen and say something to Chalue, and she heard them both laugh. She testified that it was the "very soft voice" of a man. Then Chalue became silent. She asked him who was with him. Finally, he answered that it was "Johnny," the neighbor from downstairs. She asked him several times whether everything was all right. He kept responding, "[S]ure, why wouldn't it be?" Johnny Arel testified at trial that he was not in Chalue's apartment, or indeed in the building, on the night in question.

Johnny's brother, Leo, who was staying in the fourth-floor apartment directly below Chalue's, testified that between 9 and 10 P.M. he heard someone going up the stairs; he went out to investigate, and spoke with Chalue, who was outside his own apartment and not within Leo's view. Leo then heard Chalue's front door close. Between midnight and 1 A.M. on August 8 he heard noises in Chalue's apartment as though furniture were being moved. A short time later he heard noises in the hallway and on the stairs outside his front door. When he turned off his radio and approached the door, the noise stopped. Leo was carrying a lantern, and its light was visible through his front door's transom. He heard the noise again twice, and, when he turned the radio off or approached the door, the noise stopped. A short time after the last noise, he heard the police cruisers arrive.

A cash register receipt for rum, cola, and ice was found, stained with blood, on the third-floor landing of the front stairs. The Commonwealth's fingerprint expert testified that he had found the defendant's fingerprints on the bottle of rum and on the partially empty bottle of cola. The Commonwealth's expert serologist testified that his tests indicated that four cigarette butts[2] which had been taken from the ashtray on the victim's kitchen table had been smoked by someone who was a "nonsecretor," i.e., who did not secrete blood group substances in his saliva. According to the expert's testimony, 20% of the population is composed of nonsecretors. A test of the defendant's saliva showed that he was a nonsecretor. Further, one of the four cigarette butts was found to contain cell material from a person with group B blood. The defendant has group B blood. According to the Commonwealth's expert, 2% of the population are nonsecretors and have group B blood.

A bloodstained knife was found on the dresser in Chalue's bedroom. The Commonwealth's expert serologist also testified that tests performed on the blood on the knife showed it to contain A and B antigens, which would be consistent with the

---

[2] Six cigarette butts were tested. The serologist testified that the other two cigarettes had been smoked by someone with group A blood.

blood being a mixture of blood of group A and blood of group B. The victim's blood type was group A. Similarly, a long-sleeved shirt found in a search of the defendant's apartment had a bloodstain containing both A and B antigens. Finally, group B blood was found on the gear shift and brake lever of the defendant's automobile.[3]

When the police officers questioned the defendant on the evening of August 8, he had a bandage on the palm of his right hand. The doctor who sutured the wound at about 8:20 A.M. on August 8 testified that in his opinion the wound had been between four and twenty-four hours old at the time he treated it. He testified that the wound could have been caused by the knife found in the victim's bedroom.

On August 8 at about 6:15 P.M. William McCarthy, captain of detectives with the Holyoke police department, dialed the defendant's telephone number, which he had found in the victim's address book next to the initials "W.H." The defendant told McCarthy that it had been three or four months since he had last seen the victim, who had once been married to the defendant's sister. He said that he had had a telephone call from Chalue at about 7 P.M. the evening before, inviting him to a "get-together," but that he had declined the invitation because he had other plans for the evening.[4] McCarthy asked Healy if he would come to the police station sometime to talk with the police officers and possibly to help them in the case. Healy made an appointment to meet with McCarthy at the police station on the following day. About twenty minutes later the defendant called McCarthy to ask whether he could come down to the station that evening, saying that he did not think he would be able to sleep that night "thinking about this." McCarthy agreed to the change.

*The denial of the defendant's motion to suppress.* Before trial, the defendant moved to suppress the statements which he

---

[3] The serologist, who had examined the gear shift and brake lever, testified that the blood on them was smeared in a way consistent with someone having held or operated them.

[4] The defendant does not argue that this telephone call between him and McCarthy should have been excluded.

had made to the Holyoke police officers on August 8. After hearing, the judge denied the motion. At trial, Captain McCarthy testified that the defendant told the police officers that on August 7 he left his apartment at about 8:30 P.M., bought a bottle of rum, two bottles of cola, and a bag of ice, drove to Chalue's apartment building, gave him what he had bought, talked with him for about fifteen minutes outside, and arrived home at about 10:15 P.M. Later in the interview, the defendant told the police officers that after leaving Chalue he had gone to two "gay" bars in Springfield and had arrived home shortly after midnight. When asked by the police officers, he stated that he was a homosexual. At all times on the evening of August 8 the defendant denied having gone into Chalue's apartment.[5] The defendant stated that he had broken a glass on his kitchen faucet and had cut his hand between his thumb and index finger at about 7:30 A.M. that morning.

The defendant argues that the judge erred in refusing to suppress all statements which he had made to the police officers at the police station on the evening of August 8. His argument is twofold. First, he claims that he should have been given the Miranda warnings when he arrived at the station but that he did not receive them until he had been booked. See *Miranda v. Arizona,* 384 U.S. 436, 444 (1966). In the alternative, the defendant claims that even if he were given the Miranda warnings, his waiver of his rights was invalid because of the coercive methods of interrogation used by the police.

The judge found that the defendant was accompanied to the police station by his roommate, George Roy. The defendant was ushered into McCarthy's office, and Roy was asked to wait outside. McCarthy began the interview by asking the defendant the names of the victim's friends, what bars and cafés the victim had frequented, and related questions. Then the defendant made the statement that he had taken Chalue the rum and cola, had spoken to him outside, and had returned home at about 10:15 P.M. McCarthy pointed out that this state-

---

[5] The defendant testified at trial. He admitted being in the victim's apartment.

ment contradicted what Healy had told him on the telephone. Healy responded that he had not gone to the apartment and that McCarthy could verify that he arrived home at 10:15 P.M. by asking Roy. When McCarthy went out of the room to question him, Roy stated that on the way to the police station he and the defendant had agreed to say that the defendant got home at about 10:15 P.M., but that it actually could have been 12:30 A.M. The judge found that McCarthy then returned to his office and gave the defendant the Miranda warnings. He found that McCarthy had recited the warnings correctly. There had been ample testimony at the suppression hearing to support all these findings. The judge was not required to believe the testimony of the defendant that he did not receive Miranda warnings until he had been booked. See *Commonwealth* v. *Day,* 387 Mass. 915, 919 (1983).

There is no merit to the defendant's argument that he should have been advised of his Miranda rights when he arrived at the police station. Miranda warnings are necessary only for "custodial interrogation[s]." *Commonwealth* v. *Bryant,* 390 Mass. 729, 736 (1984), and cases cited. Although the judge made no finding to this effect,[6] the interrogation of the defendant was clearly not custodial during the period of time before McCarthy learned from Roy that he and the defendant had agreed to lie about the time the defendant got home. The defendant went to the police station voluntarily. He was not a suspect during this first part of the interrogation. See *Commonwealth* v. *Simpson,* 370 Mass. 119, 124-125 (1976). The statements made by the defendant before receiving the warnings were properly admitted. See *Commonwealth* v. *Bryant, supra* at 737.

The judge found that when the defendant was given his Miranda warnings he responded, "Yes, I understand," and that this statement constituted a voluntary, knowing, and intelligent

---

[6] The judge made no such finding because he assumed that the only statement at issue was one made after the warnings were given. It appears that the judge's belief was based on the defendant's concession that, up to the time police officers determined from Roy that the defendant had lied, the interrogation was not custodial.

waiver of his rights beyond a reasonable doubt. He found that at the time of this waiver the defendant had been treated with courtesy by the police officers. None of the police officers had shouted at him, had touched him, or had abused him. The judge found that after the waiver the defendant again stated that he had not gone to the victim's apartment, and that this statement was uncoerced, freely made, and the product of a rational intellect. He found that when the defendant became upset, began to cry, and asked for an attorney, all questioning ceased, and no more information was volunteered by the defendant.

These findings were warranted by the evidence. The defendant's argument as to coercion is dependent on his own testimony as to threats, violence, and other coercive methods used by the police. Again, the judge was not required to believe this testimony. See *Commonwealth* v. *Day, supra.* The defendant relies on *Chambers* v. *Florida,* 309 U.S. 227 (1940), to support his argument that the fact that he was a homosexual made him more susceptible to coercion. In the absence of a finding of any coercion, however, that case is not apposite. We note that the judge found that Healy's homosexuality affected in no way, form, or manner his mental processes. There was no error in the admission of any of these statements.

*The defendant's due process claims.* The defendant makes various claims that his conviction should be reversed because his right to due process was violated by the intentional or negligent failure of the Commonwealth to conduct certain tests on physical evidence introduced at trial and to follow up certain investigatory leads. This is not a case such as *Commonwealth* v. *Bowden,* 379 Mass. 472, 485-486 (1980), where evidence of failure by the police officers to conduct certain tests or to follow certain procedures was removed from the jury's consideration. Nor is it such a case as *Commonwealth* v. *Lewinski,* 367 Mass. 889, 897-900 (1975), where the defendant moved to dismiss the case because of the Commonwealth's failure to conduct a certain test. Defense trial counsel made no such motion, nor did he object to the receipt of any testimony, or the admission of any evidence, on the ground of inadequate testing. Rather, in cross-examination, he made much of what

testing and investigation had not been performed, and in his closing argument he strenuously attacked the Commonwealth's case along these lines. There was no error.[7]

*The admission of evidence relating to homosexuality.* The defendant argues that the trial judge erred in admitting certain evidence which the defendant claims to be irrelevant and which he claims the Commonwealth offered for the purpose of prejudicing the jury against him because he is homosexual.

The defendant argues that the judge erred in admitting photographs of the victim's body, taken at the scene, which showed his genitals, and in admitting a photograph which showed the back of the victim's body and his bound hands. The defendant claims that these black and white photographs had no probative value and were prejudicial to the defendant in that they suggested that Chalue's murder was a homosexual murder. We disagree.

The photographs of the body, taken at the scene of the crime, had probative value as depictions of the position and condition of the body as the police officers found it. Whether that position and condition suggested that the murder was in any way linked to homosexual activity was a question properly to be decided by the jury. The defendant's reliance on *Commonwealth* v. *Allen,* 377 Mass. 674, 678-680 (1979), is misplaced. At issue in that case were photographs of the victim with her dress pulled up above her waist, showing bloody staining around the crotch. This staining was entirely the result of natural post mortem decomposition, and was entirely unrelated to the crime.

---

[7] Of the cases cited in the defendant's brief, nearly all are inapposite, being concerned with the loss, destruction, or withholding from the defense of evidence already in existence. Only two have to do with the failure by prosecutors or police officers to perform tests. *Adams* v. *Stone,* 378 F. Supp. 315 (N.D. Cal. 1974). *Bowen* v. *Eyman,* 324 F. Supp. 339 (D. Ariz. 1970). These cases clearly are distinguishable from the present case.

Interspersed with the defendant's claims of inadequate testing and investigation is the claim that the police officers "planted" butts of cigarettes smoked by the defendant during interrogation among the butts taken from Chalue's apartment. As with the other claims, defense counsel developed this theory freely at trial. No objection to the introduction of the cigarette butts was made at trial. No cases on this issue are cited in the defendant's brief. We need not say more.

The photographs of the staining were therefore irrelevant, and any deduction which the jury made from the staining as to the sexual nature of the crime would have been erroneous. In the case at bar, on the other hand, there is no reason to think that the photographs did not depict the body in the state in which it was left by the murderer. Furthermore, the fact that they showed the victim's exposed genitals did not make these photographs inflammatory. See *Commonwealth* v. *McGarty,* 323 Mass. 435, 438 (1948).

The photograph of the back of the body, taken just before the autopsy, was relevant because it showed the victim's bound hands. Any prejudice which otherwise might have resulted from the association of the body's position with homosexual activity in this photograph was cured by the judge's instructions. He instructed the jury that the body was not found in the position shown in this photograph and that the photograph was being offered only to show the position and condition of the hands. There was no abuse of the judge's discretion in admitting this photograph. See *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 271 (1982).

The defendant also claims error in the admission of a color photograph, taken prior to the autopsy, of the body with a probe inserted in one of the chest wounds. The angle of the probe tended to show the depth of that wound, and the photograph therefore had probative value which none of the other photographs of the body had. Furthermore, this photograph was not, in our view, inflammatory. Cf. *Commonwealth* v. *Bastarache,* 382 Mass. 86, 105-106 (1980). There was no error in admitting it. See *Commonwealth* v. *Reid,* 384 Mass. 247, 260-261 (1981).

The defendant claims that the judge erred in allowing the prosecutor to exhibit to the jury a T-shirt belonging to the defendant with the inscription, "Sex Instructor, First Lesson Free." According to police testimony, this shirt was found in Healy's apartment in the same plastic bag as the shirt with the bloodstain containing A and B antigens. The T-shirt was excluded by the judge, however, because no bloodstains had been identified on it. The record does not indicate that the T-shirt

was exhibited to the jury; furthermore, the record contains no objection or other indication that the jury saw the inscription accidentally.

The defendant argues that it was error to admit a pair of under shorts taken from the top of the dresser in the victim's bedroom. In the fly area the Commonwealth's serologist found semen containing blood group substances consistent with the victim's blood group. The defendant claims that this evidence was irrelevant and prejudicial. No objection was taken at trial to its admission or to the expert's testimony, as was required by Mass. R. Crim. P. 22, 378 Mass. 892 (1979). Considering the defendant's argument in accordance with our obligation under G. L. c. 278, § 33E, we see no error in the admission of the shorts. They were found about four or five feet from the victim's body and were especially relevant, since it appears from the record that there was no underwear on the body. The defendant argues that the admission of this evidence was prejudicial, because it suggested masturbation and homosexuality. Whether the evidence was so prejudicial that its probative value was outweighed, was a question to be determined by the judge in the exercise of his sound discretion. See *Commonwealth* v. *Clary,* 388 Mass. 583, 589 (1983); *Commonwealth* v. *Cruz,* 373 Mass. 676, 692 (1977). There was no abuse of discretion here.

The defendant claims error in the admission of testimony by the victim's girl friend as to the behavior of the victim during the week before his death when he was living alone in his apartment. She had testified to various incidents involving the victim's recent behavior. Much of her testimony was corroborated by her sister. The girl friend summed up her observations by the statement that "all that weekend he was sort of picky and I couldn't seem to make him happy."

The defendant argues that this evidence was irrelevant and "too remote in time or in cause." The judge could have concluded that it was relevant because it tended to show that in the week before his death the victim had formed a sexual relationship with someone other than his girl friend. It was not too remote in time; whether it was too remote in cause — whether

it had anything to do with Chalue's murder — was, given the circumstantial nature of this case, best left as a matter for the jury to decide in determining what weight to give to this evidence. We cannot say that the testimony did not throw light on Chalue's murder. See *Commonwealth* v. *Durkin,* 257 Mass. 426, 427-428 (1926). The defendant argues that the evidence was prejudicial to him and violated his right to a fair trial, since it tended to encourage speculation that Chalue was involved in a homosexual relationship, but this issue also properly was determined by the judge in his discretion.

The judge admitted testimony by the assistant manager of a liquor store that, on the evening of August 7, a man who bought a bottle of rum, two bottles of cola, and a bag of ice said that he did not need a bigger bottle of rum because he was "just going to a party." The judge instructed the jury that they were to consider the testimony for the limited purpose of determining whether the person who made the purchase was Healy. He instructed them that they were not to draw any inference from the testimony as to whether that person was going to a party. The defendant argues that even with this limiting instruction it was error to admit this testimony because it was hearsay and because the witness could not identify the defendant as the buyer.

It was not error to admit this testimony, although the judge did so under what we believe to be a partly erroneous theory.[8] Indeed, the judge need not have limited the purpose for which it was admitted. The statement made by the buyer was admissible to prove its truth both as an admission, see *Commonwealth* v. *Wood,* 384 Mass. 641, 642-643 (1981), and as a statement of intent, see *Commonwealth* v. *Lowe,* 391 Mass. 97, 105-106 (1984). Of course, for the statement to be competent, it had to be the defendant who made it. See *Commonwealth* v. *Wood,*

---

[8] The testimony did not tend to show that the buyer was Healy. We note, however, that the judge later indicated to counsel that he had allowed this testimony under the statement of intent theory which we here approve. Also, in his charge he instructed the jury that they could consider the "party" statement if the Commonwealth had satisfied them that it was made and that it was made by the defendant.

*supra* at 643. Although the witness could not identify the defendant as the maker of the statement, there was enough other evidence that it was the defendant to support the admission of the testimony. Cf. *Commonwealth* v. *Hartford,* 346 Mass. 482, 488 (1963); *Commonwealth* v. *Williams,* 8 Mass. App. Ct. 283, 290 n.8 (1979). Captain McCarthy had testified that the defendant had told him that on the evening of August 7 he had left his apartment at about 8:30 P.M., had bought a bottle of rum, two bottles of cola, and a bag of ice at the liquor store in question, and had taken these supplies to Chalue.[9] The cash register receipt found on the stairway of Chalue's apartment building was determined to have come from the liquor store's cash register that the assistant manager was operating on the evening of August 7. The prices on the receipt were consistent with the purchase of a quart of rum, two liters of cola, and a bag of ice. The assistant manager testified that the man who made the statement about the party made his purchases between 8 and 9 P.M. On that evening he made no sales of a bottle of rum, two liters of cola, and a bag of ice other than to the man who made the statement about the party. There was no error.

*The admission of other evidence.* The defendant claims that two other pieces of evidence admitted at trial were irrelevant and prejudicial; these claims of prejudice, unlike the above claims, do not purport to relate to the defendant's homosexuality.

Testimony was admitted from a Holyoke police sergeant that on the evening of August 1, 1980, during the fire at Chalue's apartment building, he observed the defendant watching the fire. He testified that the defendant was not observing the cellar, from where the smoke was coming, but was looking up. He further testified that the defendant seemed very excited. The sergeant next saw the defendant when he booked him in connection with the murder of Chalue. He recognized him then as the person he had observed at the fire.

---

[9] The defendant himself later testified that he had done so and that he had had a conversation with the clerk in which the *clerk* mentioned a party.

The defendant now argues that this evidence was irrelevant. No objection was made at trial. We consider the matter only to determine whether the admission of this evidence constituted error raising a substantial risk of a miscarriage of justice. G. L. c. 278, § 33E. There was no error. The evidence was relevant to show a relationship between the defendant and Chalue a short time before the murder, or as tending to show an interest on the part of the defendant in the effect of the fire on Chalue. It was also relevant as tending to disprove the version of events to which the defendant could be expected to testify at trial.[10]

The defendant's brief touches, in passing, on a claim of unfair surprise in the admission of the sergeant's testimony. Neither trial counsel was made aware by the Holyoke police department of the sergeant's evidence until March 13, 1981, during trial. The sergeant testified on March 17. Defense counsel objected that if he and the defendant had known of this evidence earlier, they could have sought alibi witnesses for the defendant for August 1, but that the lapse of time prevented them from doing so. It was within the judge's discretion whether the probative value of the evidence was outweighed by unfair surprise. P.J. Liacos, Massachusetts Evidence 409-410 (5th ed. 1981). We do not think that he abused his discretion. Defense counsel did not ask for a continuance in order to prepare a defense for this testimony. Cf. *Commonwealth* v. *Nassar,* 354 Mass. 249, 262-264 (1968), cert. denied, 393 U.S. 1039 (1969).

Unfair surprise is also an argument with respect to testimony by the Commonwealth's serologist that he detected the presence of blood on the steering wheel of the defendant's automobile. This finding was not in his report. The judge did allow the expert's testimony and noted the defendant's objection. Again, we cannot say that the judge abused his discretion.

---

[10] At the hearing on the motion to suppress, the defendant testified that he had first heard about the fire from Chalue on August 7. He could have been expected to testify at the trial and to repeat his earlier testimony. Since the evidence was relevant, it was not rendered inadmissible simply because it may have tended to show that the defendant had committed arson. See *Commonwealth* v. *Jackson,* 384 Mass. 572, 577 (1981).

The defendant also argues that the evidence should have been excluded for lack of relevance, although no objection was made on this ground at trial. He relies on *Commonwealth v. Burke,* 339 Mass. 521, 535 (1959). In the *Burke* case this court said that a small bloodstain on the seat of the defendant's automobile should have been excluded, since the police chemist was unable to determine whether it was human or animal blood or how long the stain had been there. In this case, on the other hand, although the blood on the steering wheel was so minute that the expert could not determine whether it was human or animal blood, two other stains were found in the automobile which were determined to be human blood of the same group as the defendant's blood. The expert testified that those stains were reasonably fresh. The existence of these other stains, we think, makes this case distinguishable from *Burke.* Cf. *Commonwealth* v. *Horton,* 376 Mass. 380, 396-397 (1978), cert. denied sub nom. *Wideman* v. *Massachusetts,* 440 U.S. 923 (1979).

In sum, we do not think that any of the evidence the admission of which the defendant claims to have been error should have been excluded. We add that we see no basis for the statements in the defendant's brief that the Commonwealth offered this evidence in a purposeful attempt to prejudice the jury against the defendant because he is a homosexual.

*The defendant's motion for a required finding.* The judge denied the defendant's motion, made at the close of the Commonwealth's case, for a required finding of not guilty. Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979). The standard of review is "whether there was enough evidence in the case-in-chief, when taken in the light most favorable to the Commonwealth, 'that could have satisfied a rational trier of fact of each [essential element of the offense] beyond a reasonable doubt.' " *Commonwealth* v. *Appleby,* 380 Mass. 296, 311 (1980), quoting *Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678 (1979).[11]

---

[11] Under this standard of review, we need not consider the argument in the defendant's brief which is based on the evidence offered by the defendant. The issues raised by the defendant in this latter regard were matters of credibility for the jury's determination.

Applying this standard, we think that the Commonwealth's evidence warranted the denial of the defendant's motion, especially considering the evidence as to the cigarette butts; the defendant's fingerprints on the rum and cola bottles; the cut on the defendant's hand and its age; the bloodstains on the knife, on the defendant's shirt, and in his automobile; and the bloodstained receipt. We are mindful also of the defendant's statements at the police station which placed him with the victim a few hours before his death, and the inconsistency of those statements with his statement to McCarthy over the telephone. That inconsistency could have been interpreted as showing consciousness of guilt. See *Commonwealth* v. *Watson,* 377 Mass. 814, 831 (1979).

It is well settled that a case may be submitted to the jury on the issue of a defendant's guilt on circumstantial evidence. *Commonwealth* v. *Casale,* 381 Mass. 167, 174-175 (1980). This is not a case where, on all the evidence, the question of the defendant's guilt was left to conjecture or surmise.[12] See *Commonwealth* v. *Montecalvo,* 367 Mass. 46, 54-55 (1975).

*The exclusion of certain testimony offered by the defendant.* The defendant took the stand and testified in his own defense. The defendant also called various other witnesses who, in general, corroborated his testimony.

The defendant argues that witnesses should have been allowed to testify as to various exculpatory statements made by him on the morning of August 8. His argument is on three different theories.

The defendant argues that testimony should have been allowed that he told other people on August 8 that he had been to Chalue's apartment the evening before. He claims that such testimony was admissible as tending to rebut the Commonwealth's attempt to show that his testimony was a recent contrivance formed after his contrary statements to the police officers on the evening of August 8. See *Commonwealth* v. *Zukoski,* 370 Mass. 23, 26-27 (1976).

---

[12] The defendant does not argue that the Commonwealth's evidence was insufficient to establish murder in the first degree, only that it was insufficient to establish Healy as the murderer beyond a reasonable doubt.

The answer to this claim is that, as the judge correctly ruled, the Commonwealth never attempted to make such a showing of recent contrivance. Even if the argument of defense counsel could be accepted, the defendant's statements of early August 8 still would not be admissible. "[W]here an attempt has been made to show that the witness is testifying under the influence of a motive to falsify, evidence of prior consistent statements made *before* the existence of the alleged motive is admitted by all American jurisdictions . . . to rebut the inference that the testimony was induced by the motive." *Commonwealth* v. *Haywood,* 377 Mass. 755, 763 (1979), quoting 3 J. Weinstein & M. Berger, Evidence par. 607[08], at 76-77 (1978). See P.J. Liacos, Massachusetts Evidence 168-169 (5th ed. 1981). The Commonwealth's theory was that the defendant murdered Chalue. In the Commonwealth's view, then, the defendant's motive for saying that he was in the apartment just briefly was to avoid conviction for the murder. Therefore any statement made by the defendant after Chalue's death was made *after* and not *before* the existence of the alleged motive.

Similar reasoning disposes of the defendant's argument that one of his coworkers should have been allowed to testify that on the morning of August 8 he told her that he had cut his hand on a glass that morning. The Commonwealth was not attempting to show that a motive arose between the morning of August 8 and the time of trial for the defendant to fabricate the story of the broken glass. Cf. *Commonwealth* v. *Retkovitz,* 222 Mass. 245, 250 (1915). The Commonwealth's theory was that the defendant contrived this story to hide his guilt. On that theory, the motive to fabricate existed on the morning of August 8, as well as later. There was no error.

The defendant argues that the judge should not have excluded testimony by three of his coworkers concerning statements which the defendant made to them as to his shock on learning of Chalue's death. The defendant relies on the state of mind exception to the hearsay rule. See *Commonwealth* v. *Caldron,* 383 Mass. 86, 91 (1981). However, the witnesses offered to testify not to statements made by the defendant as to his state of mind, but rather to statements made by him about the events

of the previous evening. Testimony as to such statements was not admissible. *Commonwealth* v. *Lowe,* 391 Mass. 97, 104-105 (1984).

The defendant also argues that these statements were admissible under the excited utterance exception to the hearsay rule, since they were allegedly uttered after the defendant received a telephone call from his sister telling him of Chalue's death. We need not consider whether a telephone call can be the sort of precipitating event required under the exception, nor how much time elapsed between the call and the statements. Even assuming that the judge would have been bound to accept that the defendant first learned of Chalue's death from the telephone call, we think that the statements were not of a type which would justify their admission under the exception. See *Commonwealth* v. *White,* 370 Mass. 703, 713 (1976).

The defendant claims error in the original refusal of the judge to allow Chalue's insurance agent to testify that Chalue's girl friend telephoned the agent twice in order to find out who the beneficiary on a certain policy held by Chalue was, and that she expressed an understanding that she was the beneficiary. The girl friend had testified that she telephoned the agent in order to find out to whom the proceeds belonged, but not to try to collect the money. "While . . . defendants are entitled to reasonable latitude in developing inconsistencies in a witness' testimony, the extent to which collateral matters shall be explored is in the discretion of the judge." *Commonwealth* v. *Doherty,* 353 Mass. 197, 213-214 (1967), cert. denied, 390 U.S. 982 (1968). The judge later told defense counsel that he could call the agent as a witness. If there was error in excluding this testimony it was not reversible error.

*The prosecutor's references to the defendant's homosexuality.* The defendant argues that during the prosecutor's cross-examination of defense witnesses and his closing argument he persistently made flagrantly prejudicial references to the defendant's homosexuality.[13] On reading the 3,500 pages of trial

---

[13] We have received further argument on this issue in the amicus curiae brief filed with the court by the Gay & Lesbian Advocates & Defenders, Inc.

transcript, we find no basis for this claim. The defendant refers to three questions, or series of questions, in cross-examination and to two sections of the prosecutor's closing argument. The defendant's trial counsel objected to none of these questions or arguments; nevertheless, we consider them as a part of our obligation under G. L. c. 278, § 33E. See *Commonwealth* v. *Smith,* 387 Mass. 900, 911-912 (1983); *Commonwealth* v. *Baptiste,* 372 Mass. 700, 712-713 (1977).

During his cross-examination of the defendant, the prosecutor asked him whether he had any knowledge that Chalue was bisexual. The defendant said, "I have no knowledge of that." At oral argument before us, the Commonwealth conceded that there was no evidence at trial that Chalue was bisexual. However, Chalue's girl friend testified during a voir dire hearing that the frequency of her sexual relations with Chalue had decreased over the six months prior to the murder and that Chalue had told her that, because at one time in his life he had been raped by his five brothers, he felt that he could not "please a woman." Thus, although the judge excluded this testimony, there was a basis for the prosecutor's question to the defendant, and it was not improper. See *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 413-414 (1978).

During cross-examination the prosecutor also asked the defendant whether there was a double bed in his bedroom, whether George Roy slept with him every night, and whether he had done so for the previous four years. The purpose of this questioning was to establish bias on the part of George Roy, the defendant's most important witness.[14] There was no impropriety, particularly in view of the careful instruction which the judge gave the jury on the bearing of the relationship of the two men on their credibility.

Similarly, the prosecutor questioned the defendant's aunt repeatedly as to the fact that the defendant and Roy slept in the same bed. The defendant's aunt lived with him and Roy. In view of the fact that she had told the police officers that the

[14] Further questioning was aimed apparently at establishing that it was not usual for the defendant or Roy to sleep on the living room couch where he spent at least part of the early morning hours of August 8.

two took turns sleeping on the couch, this, also, was not improper.

The defendant complains that, during closing argument, the prosecutor improperly attempted to convince the jury that the explanation by the defendant and Roy, as to why they had agreed to lie about the time the defendant returned home after seeing Chalue, was not believable. The prosecutor attempted to convince the jury by arguing that neither man hid his sexual preference and that there was no reason for Healy to fear repercussions in his business if the police officers became aware of his homosexuality. The other part of the prosecutor's closing argument objected to by the defendant was an attempt to explain why, if blood was spattered throughout Chalue's bedroom, the police officers did not discover clothing which was similarly thoroughly bloodstained in Healy's apartment. The prosecutor said: "Another significant point is made over the fact there's a lot of A type blood in the apartment. Well, Ladies and Gentlemen, you had an opportunity to view the apartment. You saw the photographs. This man was stabbed 17 times. Blood was going all over the place. Would it be logical, Ladies and Gentlemen, that the person who stabbed him could be covered with blood and would it necessarily follow, Ladies and Gentlemen, that that person [would] be wearing any clothing? Now, you've seen the photographs, Ladies and Gentlemen. The one I just showed you, what kind of activity do you think was going on in that bedroom? Ask yourselves that. Don't leave your common sense at home. Does it necessarily follow, Ladies and Gentlemen, that that person who was with Mr. Chalue had any clothes on at all? Could you infer, Ladies and Gentlemen, that he washed the blood off and walked through the bedrooms and walked into the kitchen and washed that blood off? Mr. Chalue was naked except for pants below his knees. Do you think you can infer that this person was necessarily clothed that was with him in that bedroom?"

We think that both portions of the prosecutor's closing argument were proper, as they were "limited to the evidence and the fair inferences from the evidence." *Commonwealth* v.

*Clary,* 388 Mass. 583, 592 (1983). This case differs from *Clary* in that the defendant's homosexuality and his homosexual relationship with Roy were established. In fact, they formed part of the defense. We agree that it would be improper for the prosecutor to have suggested that the fact that the defendant was homosexual made him more likely to commit murder, or to have suggested that the mere fact that he was homosexual was enough to link him to Chalue's murder. The prosecutor suggested neither. Nor do we think that, in the part of his closing argument quoted above, the prosecutor insinuated a sexual or homosexual element to Chalue's murder which was not fairly inferable from the evidence in the case.

*The defendant's motions for a new trial.* During the trial it came to the attention of the prosecutor that the foreman of the jury, Paul L. Briere, might have been subjected to extraneous influences in the form of improper communications by a third person. See *Commonwealth* v. *Fidler,* 377 Mass. 192, 197 (1979). The third person was a law student, Paul Ramy, who was employed by the same company as Briere. One of Ramy's fellow law students worked in the office of the district attorney; it was through him that the prosecutor learned that Ramy had made statements which indicated that he had been having conversations about the trial with the foreman.

On April 2, 1981, just before closing arguments, the judge questioned the fellow law student, examined Ramy under oath, and also questioned the foreman. These sessions were held separately in the judge's lobby in the presence of counsel. Counsel were permitted to question the first two, and apparently to suggest questions to the judge to ask the foreman.

Ramy testified that Briere had said that he had been made foreman; that many exhibits had been introduced and it had been a "very long day"; that it was a difficult case; that he hoped the jury would be able to bring a transcript to the jury room with them. When Briere was first empanelled, Ramy told him that he could not look at Ramy's evidence books. Briere never commented to Ramy on the evidence, asked him about the admissibility of evidence, or talked to him about what was going on in the courtroom.

Briere stated that he had asked Ramy whether a jury were allowed to take a transcript of the trial into the jury room and that he had speculated to Ramy as to whether evidence was being questioned. He said, "The questions I asked were general in nature and have nothing to do with the specifics of the case." He denied having discussed the evidence, its admissibility or exclusion, or any other aspect of the case with Ramy. The judge instructed the foreman that he could consider only the evidence he heard in the courtroom and that he had to take the law from the judge. He told him to tell the rest of the jury that he had been in the lobby discussing scheduling with the judge. The judge also told Briere not to entertain a grudge against either side because he had been questioned. Briere resumed his seat on the jury. The record indicates no objection by either counsel.

After the verdict and sentencing, defense counsel reported to the judge that another lawyer, Mr. Greg T. Schubert, had told him that he heard from Paul Ramy that the judge had been in the jury room during deliberations.[15] Mr. Schubert also told defense counsel that Ramy and Briere had been living in the same apartment during the trial. Neither Ramy nor Briere had revealed this fact to the judge on April 2.

As a result of questioning Mr. Schubert, on April 16 the judge conducted further questioning of Briere, Ramy, and the law student who worked in the office of the district attorney. Counsel had the opportunity to ask questions of all three men on this day. Briere stated, under oath, that because of marital problems he had been renting a room from Ramy during the period of the trial. He testified that he had told Ramy during the trial that he could not discuss the case with anyone. He had asked Ramy if the jury could see a transcript and what a "voir dire" was. Ramy had told him that he knew someone who was a spectator at the trial. Ramy had said that that person was known to him only as "Dick." Sometimes at night he would repeat "Dick's" comments to Briere. Briere "tried very

---

[15] There is no question that there was no basis for this rumor. The judge talked to the jury in the jury room *after* their verdict.

hard to be stoic." At various points Ramy said that he heard that the defendant took the stand that day or that there had not been a trial another day. Defense counsel asked Briere if Briere had had a conversation with Ramy about the credibility of the defendant's testimony, along the line indicated by Ramy's statement to his fellow student. Briere replied, "No, I didn't."

Ramy's testimony on April 16 was consistent with his earlier testimony as to conversations he had had with Briere about the trial. However, it became clear on April 16 that Ramy had been evasive on April 2 about the fact that Briere was living with him. On April 16 Ramy was extremely evasive, to put it charitably, about what he had said and to whom he had said it relative to the judge's being in the jury room; during what period Briere was living with him; and whether he had told Briere about what had been said at Ramy's first visit to the judge's lobby. Furthermore, Ramy was unable to give any more information about "Dick" other than that "Dick" was not a lawyer or a law student, that he had met "Dick" sixteen years before in a bowling league, and that he had had the conversation about the trial with him at a supermarket meat counter. He swore "[u]nequivocally," though, that " 'Dick' was not Paul Briere."

The judge had referred to "Dick" as "mysterious" and said that defense counsel probably thought that "Dick" was Briere and would be perfectly right in filing a motion for a new trial. He had advised Ramy to get a lawyer and to return on another day. At the end of the hearing the judge asked Ramy to try to locate "Dick" and to bring him back to the court. The judge said, "[T]he only thing I'm interested in is quite frankly to make sure the verdict was not tainted by the outside news, or by any members of the jury . . . . So, bring in this guy 'Dick' . . . if there is such a person because I want to make sure the verdict was not tainted in any way, shape or manner." He set a further hearing for April 28, but no further hearing was held.[16]

---

[16] On April 23, 1981, the trial judge became an Associate Justice of the Massachusetts Appeals Court.

In July, 1981, the defendant filed a motion for new trial claiming extraneous influence on Briere during the trial. In August, 1981, a judge, other than the trial judge, heard argument on the motion but ruled that an evidentiary hearing was not required. On September 8, 1981, this judge denied the motion. As stated in the beginning of this opinion, the defendant has appealed from that denial and has filed another motion for new trial in this court. See G. L. c. 278, § 33E.

The denial of the defendant's first motion for new trial was proper. As the Commonwealth argued and as the judge stated at the August hearing, a motion for a new trial should not have been filed in the Superior Court during the pendency of the defendant's appeal from his conviction. See Reporters' Notes to Mass. R. Crim. P. 30 (b), Mass. Ann. Laws, Rules of Criminal Procedure at 484 (1979).

Although the trial judge had set a date for a further hearing that was never held, we see nothing in the record of the lobby conferences of April 2 and April 16 to necessitate a further evidentiary hearing. There was no testimony on either of those dates as to any extraneous influence on Briere. Even if it were assumed that Briere was "Dick" and that he did express to Ramy his views on the defendant's credibility, this does not constitute an extraneous influence on Briere. Additionally, the motion judge acted within his discretion, based on a review of the transcripts of the prior hearings, affidavits submitted, oral argument, and memoranda of law, in concluding that no further evidentiary hearing was required. He also was within his discretion in ruling that the attempt to use the motion for a new trial as an investigatory procedure was improper. Cf. *Commonwealth* v. *Fidler,* 377 Mass. 192, 201 n.8, 203 (1979). Hence, we conclude there was no error.[17]

---

[17] We deny the motion for new trial pending before us on the same grounds. We also deny the defendant's motion for permission to interrogate jurors and witnesses and his motion to disqualify the motion judge. His motion for a stay of execution of sentence and for an order admitting him to bail pending appeal are now moot.

*G. L. c. 278, § 33E.* On consideration of the whole record of this case, we see no reason to exercise our power under G. L. c. 278, § 33E, either to order a new trial or to reduce the verdict.

*Judgment affirmed.*

*Order denying first motion for new trial affirmed.*

*Second motion for new trial and related motions denied.*