# United States Court of Appeals

## For the First Circuit

No. 06-1269

WAYNE BLYTH HEALY,

Petitioner, Appellee,

v.

LUIS SPENCER,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Boudin, Chief Judge,
Lynch and Howard, Circuit Judges.

Maura D. McLaughlin, Assistant Attorney General, Criminal Bureau, with whom Thomas F. Reilly, Attorney General, was on brief, for appellant.
Wendy Sibbison for appellee.
Gary D. Buseck and Mary L. Bonauto on brief for Gay & Lesbian Advocates & Defenders, amicus curiae.

June 27, 2006

**LYNCH**, <u>Circuit Judge</u>.  Petitioner Wayne Healy was tried in 1981 for the murder of Richard Chalue, who had been found stabbed to death in his home.  At trial, the prosecution suggested, in response to certain defense arguments, that Healy killed Chalue during a homosexual encounter gone awry.  Healy was convicted and is now serving a life sentence.

More than fifteen years later, in response to a discovery request connected to Healy's third motion for a new trial, prosecutors for the first time turned over to Healy a pathologist's report from the post-mortem examination of Chalue.  (Healy had had access all along to a shorter, final autopsy report).  This preliminary report said an examination of Chalue's genitals and rectum had revealed no marks suggestive of sexual activity.  Based on this information, Healy subpoenaed the hospital where the exam was conducted; in response, the hospital turned over a handwritten note stating that smears from Chalue's mouth and rectum had tested negative for sperm.

Relying on these documents, Healy in 1999 filed an amended motion for a new trial in state court on the ground that the prosecution had suppressed exculpatory evidence in violation of his due process rights.  See <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963).  He argued, inter alia, that the newly turned-over portion of the report on the post-mortem exam tended to prove that the killing did not occur in connection with a sexual encounter, and that this

would have made a crucial difference at trial. The Massachusetts Supreme Judicial Court (SJC) rejected his claim. See Commonwealth v. Healy (Healy II), 783 N.E.2d 428 (Mass. 2003). Healy then petitioned the federal court for habeas corpus.

The district court granted habeas corpus relief. The court said the SJC had erred by failing to recognize the centrality of the sexual encounter theory and by not explicitly factoring into its analysis "how extremely close a case" the murder trial had been. Healy v. Spencer (Healy III), 397 F. Supp. 2d 269, 290, 293 (D. Mass. 2005).

We reverse. The SJC considered the whole record and reached a well-reasoned, supportable conclusion that Healy had not demonstrated Brady prejudice. Its analysis was not "objectively unreasonable," Lockyer v. Andrade, 538 U.S. 63, 75 (2003), and the writ should not have issued.

I.

We describe the facts as they were found by the SJC, supplemented with other record facts consistent with the SJC's findings. Lynch v. Ficco, 438 F.3d 35, 39 (1st Cir. 2006).[1]

---

[1] Healy says on appeal that the Commonwealth "suggests that this Court's review is restricted to the SJC's recitation of the evidence." While the Commonwealth may have made this argument before the district court, it did not do so on appeal. In any event, our precedent makes clear that we may at least consider other facts from the record consistent with the state court's findings, Lynch, 438 F.3d at 39, and furthermore here the SJC explicitly said it had considered the entire trial record.

Police came to Chalue's apartment in Holyoke, Massachusetts, early on the morning of August 8, 1980, after receiving a report that Chalue had been screaming for help. Healy II, 783 N.E.2d at 431. The police found Chalue dead on his bed, stabbed seventeen times in the chest, neck, and thigh. Id. Chalue had on a pair of jeans, which were pulled halfway down his legs; he was otherwise naked. His hands were bound with socks; he also was gagged. Id. On top of a dresser in the bedroom, approximately four to five feet from the body, police found a pair of underwear. Testing of the underwear revealed the presence of semen consistent with Chalue's blood group. Id. The pathologist who conducted Chalue's autopsy opined, based on the location and angle of the wounds, that the perpetrator had been kneeling on the bed at the time the wounds were inflicted. Id.

A bloodstained knife was found on the dresser in Chalue's bedroom. Id. On the table in Chalue's kitchen were a partially empty bottle of rum, two bottles of cola, a glass, and an ashtray containing cigarette butts. Commonwealth v. Healy (Healy I), 471 N.E.2d 359, 364 (Mass. 1984). Police also found a receipt for rum, cola, and ice, stained with blood, on the third-floor landing in Chalue's apartment building. Id.

Police contacted Healy after finding his telephone number in Chalue's address book. Id. Healy at first said he had not seen Chalue in months. He later changed his story, telling police that

-4-

he had purchased the rum, coke, and ice and brought it to Chalue that evening, but had not gone inside.  Id. at 365.  Healy also lied about the timing of his movements that night:  In an interview with police on the evening of August 8, Healy stated that after leaving Chalue, he had returned home by 10:15 p.m., and that police could verify that with Healy's roommate, George Roy.[2]  When questioned, however, Roy admitted that he and Healy had agreed to say Healy returned home at 10:15 p.m. but that it actually might have been closer to 12:30 a.m.  Id.  Healy then admitted to police that he had not gotten home by 10:15 p.m., but instead had gone out to two gay bars after leaving Chalue.  Id.

At Healy's trial, the prosecution introduced a variety of circumstantial evidence tying him to the crime.  The Commonwealth's fingerprint expert testified that Healy's fingerprints were on the rum and cola bottles, and that at least one of the cigarettes in the ashtray on Chalue's table had been smoked by someone who was both a "nonsecretor," i.e., who did not secrete blood group substances in his saliva, and who had Type B blood.  Id. at 364.  Healy was a nonsecretor with Type B blood; the Commonwealth's expert testified that these two characteristics appear together in only 2% of the population.  Id.

---

[2] Healy first described Roy as his roommate.  The two were also lovers, a fact both testified to at trial.

The Commonwealth's expert serologist testified that the blood on the knife contained antigens consistent with a mixture of blood of Types A and B, and that a long-sleeved shirt found in Healy's apartment also had a small bloodstain with both A and B antigens. Chalue's blood was Type A. Id. Finally, Type B blood was found on the gear shift and brake lever of Healy's car, and police officers who questioned Healy on the evening of August 8 saw that he had a bandage on the palm of his right hand. The doctor who had sutured Healy's wound earlier that evening testified that in his opinion the wound had been between four and twenty-four hours old at the time he treated it, and that Healy's wound could have been caused by the knife found in Chalue's bedroom. Id.

Testifying at trial, Healy said he had cut his hand on a broken glass in his kitchen on the morning of the 8th. Id. at 365. He admitted that, contrary to his earlier statements to police, he had gone inside Chalue's apartment the night of the murder. Id. at 371. As to Healy's lies about what time he had come home that night, Healy and Roy both testified that Healy had lied because he had not wanted to disclose to the police that he was homosexual. Healy II, 783 N.E.2d at 432. The prosecution countered that explanation with evidence that Healy had led an openly gay lifestyle, id., suggesting that the lie was not explained by the reason Healy gave.

Later, during closing arguments, the defense argued that the absence of blood on the clothes Healy said he had been wearing that night[3] meant he could not have been the person who stabbed Chalue seventeen times. Healy I, 471 N.E.2d at 373. The prosecution responded to this defense claim in its own closing by arguing that the killer might well have been nude, thus explaining why the killer's clothes might not have been bloody:

> This man was stabbed 17 times. Blood was going all over the place. . . . Now, you've seen the photographs, Ladies and Gentlemen. The one I just showed you, what kind of activity do you think was going on in that bedroom? Ask yourselves that. Don't leave your common sense at home. Does it necessarily follow, Ladies and Gentlemen, that that person who was with Mr. Chalue had any clothes on at all?

Id.

The case went to the jury on April 3, 1981. In the course of the deliberations, the Commonwealth made two motions for mistrial. The first was based on a juror's requested re-instruction on permissible inference, reasonable doubt, and circumstantial evidence. The second came after a local newspaper published an article on the case which was prejudicial to the prosecution. In considering the second motion, the trial court

---

[3] Healy apparently testified at trial that he had been wearing jeans and a short-sleeved shirt that night, not the long-sleeved shirt on which the police found a small blood stain. See Healy III, 397 F. Supp. 2d at 279. Small stain or no, the thrust of the defense argument was that Healy's clothes would have been soaked in blood if he were the perpetrator.

noted that the trial was "delicate" and that "a small matter . . . could tip the balance."

The trial court ultimately denied the motions for mistrial. The jury returned a conviction on April 8; the next day, Healy was sentenced to life in prison.

In preparation for Healy's trial, prosecutors had turned over to the defense a final autopsy report containing Chalue's cause of death and a gross anatomical description. Healy II, 783 N.E.2d at 433. However, prosecutors had not turned over either the earlier report discussing the examination of the victim's rectum and genitalia or the handwritten notes reporting the absence of sperm.[4] On April 11, 1997, Healy brought a third new trial motion[5] and requested additional discovery; this request led to production of the earlier report and the notes. Healy subsequently filed an amended new trial motion asserting his Brady argument. Following an evidentiary hearing, a state Superior Court judge denied the

_____

[4] The Commonwealth argued in state court that the earlier report in fact had been disclosed to the defense in preparation for trial. The motion judge, however, found that the report was not disclosed. The SJC declined to disturb that finding of fact. Healy II, 783 N.E.2d at 433 n.6.

[5] Healy brought his first two new trial motions in the immediate aftermath of his conviction. Both were denied by the SJC in Healy I. See 471 N.E.2d at 375 & n.17.

-8-

motion.  The SJC affirmed in Healy II.  On November 8, 2005, the district court granted habeas relief.[6]

II.

A.          Standard of Review

Our review of a district court's grant or denial of habeas is de novo.  Norton v. Spencer, 351 F.3d 1, 4 (1st Cir. 2003).  Put differently, the district court opinion, while helpful for its reasoning, is entitled to no deference.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1218-19, our standard of review of the SJC's decision depends on whether that court "adjudicated on the merits" Healy's Brady claim.  28 U.S.C. § 2254(d).  If it did, we review only to determine whether its conclusion "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  McCambridge v. Hall, 303 F.3d 24, 34 (1st Cir. 2002) (en banc) (internal quotation marks omitted) (quoting 28 U.S.C. § 2254(d)); see also Lockyer, 538 U.S. at 75 (holding that state court's analysis must be "objectively unreasonable" to run afoul of the "unreasonable application" prong).  If it did not, we review de novo.  McCambridge, 303 F.3d

_____

[6] The district court ordered that Healy be retried or released by March 1, 2006, and denied the Commonwealth's motion for a stay. On February 23, 2006, this Court reversed that order and entered a stay of release pending appeal.

-9-

at 35. Here, as Healy concedes, the "objectively unreasonable" standard applies. We explain why.

There are three components to a Brady claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see also Banks v. Dretke, 540 U.S. 668, 691 (2004). Prejudice exists only if there is a "reasonable probability of a different result" had the evidence been disclosed. Banks, 540 U.S. at 699 (internal quotation marks omitted) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)); see also McCambridge, 303 F.3d at 37. "Reasonable probability" denotes a probability sufficient to "undermine confidence in the verdict." Kyles, 514 U.S. at 435.

The SJC assumed that the first two elements of a Brady claim -- that the evidence was favorable to the defendant and that it had been withheld by the prosecutor -- had been made out. Healy II, 783 N.E.2d at 435. In analyzing the third element, prejudice, the SJC acknowledged the Brady standard. The SJC chose to use what it has characterized as its more defendant-friendly state standard for prejudice, applicable in certain Brady-type cases. Id. (citing Commonwealth v. Tucceri, 589 N.E.2d 1216, 1220, 1223 n.11 (Mass. 1992) (stating that the SJC's prejudice standard is "more favorable

-10-

to defendants than the Federal Constitutional standard")). The SJC stated that the defendant bore the burden of establishing a "'substantial basis' for . . . claim[ing] prejudice." Healy II, 783 N.E.2d at 435 (quoting Tucceri, 589 N.E.2d at 1223). It said prejudice is measured by whether the reviewing court, examining the entire record, "can be confident that, even if the prosecution had supplied the report to the defendant[] in timely fashion, the report or available evidence disclosed by it would not have influenced the jury." Id. (alteration in original) (internal quotation marks omitted) (quoting Commonwealth v. Daye, 587 N.E.2d 194, 200 (Mass. 1992)). Since the SJC used a standard more favorable to Healy than the federal standard, we consider the Brady issue to have been "adjudicated on the merits" within the meaning of 28 U.S.C. § 2254(d). See McCambridge, 303 F.3d at 35 ("If there is a federal or state case that explicitly says that the state adheres to a standard that is more favorable to defendants than the federal standard (and it is correct in its characterization of the law), we will presume the federal law adjudication to be subsumed within the state law adjudication.").

As a federal court sitting in habeas, then, we utilize the Brady standard of prejudice and ask whether the SJC's conclusion that there was no prejudice was "objectively unreasonable." Lockyer, 538 U.S. at 75. For a conclusion to be objectively unreasonable, it must carry some increment beyond

-11-

merely being incorrect.  See McCambridge, 303 F.3d at 36 ("[T]he mere fact that there was some error or that the state decision was incorrect is not enough."); see also Williams v. Taylor, 529 U.S. 362, 410-12 (2000).  On the other hand, a state court's analysis is not to be deemed reasonable merely because "it is possible that a competent court could have reached the same conclusion." McCambridge, 303 F.3d at 36.  "The range for what is an unreasonable application must fall somewhere between the two. Within that range, if it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application." Id.

B.      Analysis

The premise of Healy's Brady argument, both before the SJC and on federal habeas, is that the post-mortem report and notes were significant because they did not show signs of recent sexual activity by the victim.  Healy argues that this absence of evidence of sexual activity, in turn, was significant for two reasons: First, it undermined the Commonwealth's theory that the murder was a result of a homosexual encounter gone wrong.  (It is this initial theory of prejudice on which the federal habeas claim largely rests).  Second, it would help the defense theory that the police were biased against homosexuals, and that their investigation was slanted and suspect.  This, Healy argues, was because the preliminary report shows that the police were considering Chalue's

-12-

killing a homosexual-related murder and instructing the pathologist to search for evidence of homosexual activity from the outset.

The SJC "reviewed the entire trial transcript," Healy II, 783 N.E.2d at 438, and recounted the facts at some length, id. at 430-33. It rejected Healy's Brady arguments.

As to the second Brady argument, the bias claim, the SJC disagreed that "mere examination and testing of the victim's body for signs of sexual activity somehow suggests police bias. From the condition of the victim at the crime scene . . . it would be reasonable for the police to consider and investigate the possibility that the murder had some connection to sexual activity." Id. at 438.

As to Healy's initial theory of prejudice -- the sexual encounter argument -- the SJC responded, quite reasonably, that the theory was weak on its own terms for several reasons and could not demonstrate a likelihood of prejudice. First, the fact that the withheld evidence excluded certain forms of sexual activity did not itself mean that no form of sexual encounter took place. Id. at 436. Second, the SJC reasoned, the state of the record without the suppressed materials was essentially the same as with those materials: The prosecution at trial had introduced no evidence of recent sexual activity by the victim, so Healy was not deprived of the ability to argue that there was no sexual activity. Id. at 437. Further, Healy had chosen not to make this argument of no

sexual activity at trial, when it was available, thus undermining the assertion that it was an important argument for the defense to make. Id. at 437-38.

The methodology used by the SJC is not to be faulted. As its careful ten-page opinion demonstrates, the SJC reviewed the entire record, discussed each of the defendant's arguments, and provided reasoned rejections for each point the defendant raised. For this reason, the state court decision cannot be attacked on the basis that it is "devoid of record support for its conclusions or is arbitrary." McCambridge, 303 F.3d at 37. It is a daunting task for a habeas petitioner to show that a considered opinion by the state's highest court is objectively unreasonable when that court has made an evaluative judgment, based on the entire record and applying the correct legal standard, that the petitioner has not met the Brady standard for prejudice. Where petitioners have succeeded in such claims post-AEDPA, it has sometimes been because the state court made an error of law as to the standard to apply. See Bailey v. Rae, 339 F.3d 1107, 1118 (9th Cir. 2003) (finding state court's Brady decision unreasonable where it used a state-law prejudice standard less favorable to petitioner than the federal standard). No such error is present here; indeed, the SJC concluded there was no prejudice on a standard more favorable to Healy than that required under federal law. It also bears note that the SJC was affirming, not reversing, the finding of the

-14-

motion judge, who also applied the correct standard, that no new trial was warranted.

Turning to Healy's arguments on habeas, we quickly dispatch, as did the district court, Healy's second prejudice claim -- that the SJC was objectively unreasonable in rejecting the theory of police bias. The victim's largely unclothed body, found on a bed, raised an obvious possibility of a sexual encounter which the police were well warranted in investigating.

As to Healy's principal theory of prejudice: The SJC's conclusion that the withheld evidence did not come close to disproving a sexual encounter was not unreasonable. As the SJC wrote, "[t]here is a wide range of sexual activity, up to and including many forms of sexual assault, that leaves neither sperm nor signs of injury to sexual organs." Healy II, 783 N.E.2d at 436. Further, the SJC was correct to note that even absent the withheld materials, the defense could have argued that the Commonwealth had introduced no direct evidence that a sexual encounter had in fact occurred.[7]

Healy argues to us that the defense could have used the withheld evidence to dramatic effect not just to disprove the idea

_____

[7] On habeas, Healy argues that the defense surely would have made this argument had there been corroboration, which the withheld documents would have provided. But even if this is so, it does not mean the SJC's no-prejudice finding was objectively unreasonable, particularly given its conclusion as to the limited probative force of the withheld evidence.

-15-

that there was a sexual encounter, rendering it less likely the killer was nude (and thus reinforcing the importance of the lack of blood on Healy's clothes), but also to negate the relevance of the semen-stained underwear, to corroborate Healy's testimony that he had no sexual relationship with Chalue, and to undercut the prosecution's purported attempts to "establish[] a 'homosexual murder' theory as a substitute for the missing evidence of motive." But even accepting Healy's premise that it was essential for the prosecution to prove a sexual encounter (which premise the SJC did not accept, as we shall see), the SJC's conclusion that the evidence's suppression did not meet the Brady prejudice standard was not objectively unreasonable. The withheld evidence was of only limited probative value regarding the likelihood of a sexual encounter based on the record viewed as a whole, and its suppression did not create a new argument for the defense which was not already available at trial. The SJC's decision that there was no prejudice was objectively reasonable, and habeas must be denied on this basis alone.

Although no more is needed to deny habeas relief, we go on to comment on the other arguments made.

In a second line of reasoning, not dependent on the first, the SJC rejected the defendant's very premise that it was key to the prosecution to show the murder had occurred during a homosexual encounter. The SJC, having reviewed the record, found

-16-

that the homosexual encounter theory was significant only in a "narrow, limited" sense.  Healy II, 783 N.E.2d at 436.  The prosecutor, in his closing, did not express such a theory, the SJC noted.  Id.  The prosecutor mentioned it only in the Commonwealth's rebuttal closing, in response to the defense argument that if Healy had killed the victim, Healy would have been drenched in the victim's blood.  This demonstrated, the SJC said, that the "only way" the sexual nature of the encounter "had any significance was to establish the reasonable possibility that the perpetrator may have been naked, so that the jury would not attach undue importance to the fact that the defendant's shirt was bloodstained in only one small area."  Id. at 437.

In granting habeas, the district court found two main faults with the SJC's analysis, which it felt made the SJC's decision objectively unreasonable.

### The Closeness of the Case

First, the federal court said, the SJC's conclusion that confidence in the trial was not undermined could only be reached by ignoring how extremely close the case was.  The federal court impermissibly faulted the SJC for "ignoring" (by not explicitly mentioning) the trial judge's statement that the case was close.  Healy III, 397 F. Supp. 2d at 311.  The federal court erred in its approach.

-17-

The district court misread the SJC's opinion. The SJC did not ignore the relative strengths and weaknesses of the case. It expressly said it had considered the entire record, Healy II, 783 N.E.2d at 438, and it acknowledged that the Commonwealth's case rested on circumstantial evidence, id. at 431. The SJC explained with analytic clarity and precision how the suppressed material could have affected the issues in the case. It expressly addressed the arguments made. The SJC was not required to explicitly address the trial judge's statement at all, much less when the statement was made in a different context on a different issue.[8]

Further, we held in Bui v. DiPaolo, 170 F.3d 232 (1st Cir. 1999), that "it is not necessary that the federal court agree with every last detail of the state court's analysis. By like token, state courts are not required to supply the specific reasons that a federal court thinks are most persuasive for upholding the judgment." Id. at 243. But this is the very approach the district court took. The district court was not obligated, as it said it was, to make its own determination of whether it was deprived of confidence in the jury verdict, as though it were engaged in de

_____

[8] The trial judge's comment did not occur in a vacuum. The judge noted that the case was circumstantial during a discussion of the potential prejudicial effect of the newspaper article, and of whether mistrial was warranted. The judge inquired of each juror whether he or she had seen the article and eventually returned the jury to deliberations. None of this undermines the reasoning of the SJC, which itself stressed that the prosecution's case was circumstantial.

-18-

novo review. Its task was limited to determining, irrespective of whether it differed with the SJC's conclusion, the separate question of whether the petitioner met his burden to show that that conclusion was objectively unreasonable. The SJC's conclusion was not objectively unreasonable.

The Centrality of the Sexual Encounter Theory

The district court also concluded that the SJC had unreasonably downplayed the role of the homosexual encounter theory in this case. Healy III, 397 F. Supp. 2d at 292-93. But this conclusion is a simple difference of opinion with the SJC about the import of the evidence. The SJC did not ignore the point that the homosexual encounter theory played a role in the trial. It expressly acknowledged that "there was extensive reference at trial to the defendant's homosexuality." Healy II, 783 N.E.2d at 437. Even if one could, on de novo examination, reach a different conclusion as to the effect of the withheld evidence, that is no warrant for a finding that the SJC's conclusion was unreasonable.

Underlying the district court's opinion is a concern about the possibility of homophobia playing a role which tainted the jury deliberations and verdict. This concern is shared by, and discussed in, the brief amicus curiae filed by the Gay & Lesbian Advocates & Defenders. Without in the least discounting the described issues of bias and stereotyping in the abstract, the concern has little to do with the Brady prejudice issue presented

-19-

in this case.[9]  The SJC understood that the defense as well as the prosecution relied on evidence of Healy's homosexuality.  The issue presented by this habeas petition is not whether Healy was or was not homosexual; he said he was.  On the very narrow issue of constitutional law before it, the SJC reasonably concluded that the suppressed evidence neither confirmed nor excluded a sexual encounter, and that given this limitation on the probative value of the evidence, its exclusion from the trial did not undermine that court's confidence in the jury verdict.

We <u>reverse</u> the issuance of habeas corpus and <u>remand</u> to the district court for further proceedings consistent with this opinion.

---

[9]  The issue on which habeas is sought is not that of questioning prospective jurors for bias as to homosexual sexual behavior, <u>cf.</u> <u>Ham</u> v. <u>South Carolina</u>, 409 U.S. 524, 527 (1973) (holding that the Due Process Clause required the state court to ask the venire brief general questions about race where the defense was arguing that police officers were "out to get" the black defendant because of his civil rights activities), nor should we be understood as suggesting any such questioning was required, <u>see</u> <u>Mu'Min</u> v. <u>Virginia</u>, 500 U.S. 415, 431-32 (1991) (rejecting due process challenge to court's failure to individually question jurors about pretrial publicity); <u>Ristaino</u> v. <u>Ross</u>, 424 U.S. 589, 598 (1976) (finding no due process violation from court's failure to ask the venire about racial prejudice, where the victims were white and the defendants black but the "special factors" present in <u>Ham</u> were missing).