# United States Court of Appeals
## For the First Circuit

Nos. 06-2692, 06-2693

RICHARD MUNIZ,
VICTOR GONZALEZ,

Petitioners, Appellees,

v.

CAROLYN A. SABOL, WARDEN,

Respondent, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Boudin, Chief Judge,

Howard, Circuit Judge,

and O'Toole,* District Judge.

Mark J. Grady, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellant.
Judith H. Mizner, Assistant Federal Public Defender, with whom Miriam Conrad, Federal Public Defender, Districts of Massachusetts, New Hampshire and Rhode Island was on brief, for appellees Muniz and Gonzalez, amicus curiae.
Richard Muniz and Victor Gonzales, appellees, on brief pro se.

_____

*Of the District of Massachusetts, sitting by designation.

Peter Goldberger on brief for Families Against Mandatory Minimums Foundation, The National Association of Criminal Defense Lawyers and The Criminal Justice Act Board for the United States District Court for the District of Massachusetts, amici curiae.

February 26, 2008

**HOWARD**, <u>Circuit Judge</u>.  This case requires us to decide whether the Bureau of Prisons (BOP) may, through rulemaking, deny placement in a community corrections center (CCC)[1] to all prisoners during the first ninety percent of their sentences.  The question has divided district court judges in this and other circuits, although the four circuit courts of appeal that have considered the issue have determined that the BOP lacks such authority.[2]  Each of the circuit opinions has been accompanied by a dissent.  While we are loathe to create a circuit split, we respectfully side with the dissenters.  The BOP may make rules of general applicability to guide the individualized application of its discretion.  Of course those rules must conform to the strictures of the Administrative Procedures Act, 5 U.S.C. § 555 <u>et seq.</u> (APA).[3]  And, as here, where Congress has mandated that the BOP consider certain factors

---

[1]CCCs are also referred to as Residential Re-entry Centers (RRCs) or, more familiarly, "halfway houses."  We consider these terms synonyms for the purposes of this opinion.

[2]<u>Wedelstedt</u> v. <u>Wiley</u>, 477 F.3d 1160 (10th Cir. 2007) (2-1 decision); <u>Levine</u> v. <u>Apker</u>, 455 F.3d 71 (2d Cir. 2006)(2-1 decision); <u>Fults</u> v. <u>Sanders</u>, 442 F.3d 1088 (8th Cir. 2006) (2-1 decision); <u>Woodall</u> v. <u>Fed. Bureau of Prisons</u>, 432 F.3d 235 (3d Cir. 2005) (2-1 decision).

[3]Amici curiae Families Against Mandatory Minimums Foundation, the National Association of Criminal Defense Lawyers, and the Criminal Justice Act Board for the United States District Court for the District of Massachusetts provided a scholarly and substantial brief arguing that the BOP violated the Administrative Procedures Act when it promulgated these regulations.  We do not consider the issue.  Because the issue was not joined below, we assume, without deciding, that the regulations were adopted in accordance with the APA.

in its determination, the rules the BOP makes must still leave room for meaningful consideration of the factors. Our analysis differs from the other circuits in two important respects. First, our analysis of the statute reveals that the decision whether to transfer an inmate is not constrained by the factors Congress lists, although the decision where to transfer an inmate might be. And second, even in initial assignment decisions, the question whether a CCC is appropriate is only a part of the overall decision with which the BOP is charged by statute. The remaining options provide opportunity for meaningful individualized consideration, as the statute implies. Because the BOP is merely setting background rules for the operation of its discretion, the BOP can apply its regulation and still comply with the statute.

Petitioners Richard Muniz and Victor Gonzales sought writs of habeas corpus pursuant to 28 U.S.C. § 2241. Each claimed that BOP regulations delaying his transfer to a CCC were contrary to the BOP's statutory mandate and therefore invalid. The district court consolidated the cases, agreed with the petitioners, and granted the petitions. The district court also certified the two cases under 28 U.S.C. § 1292(b), finding that there was a "controlling question of law" (the legality of the BOP regulations) as to which there was "a substantial ground for difference of opinion" (the split in the district courts). The BOP appealed.

1.       **The Statute**

The authority to assign and transfer prisoners to places of confinement is conferred on the BOP by 18 U.S.C. § 3621(b).[4] The statute affords the BOP wide discretion to choose any "appropriate and suitable" facility, "considering" five factors. Broadly, those are the facility, the offense, the prisoner, any statement of the sentencing court, and any pertinent policy statement issued by the Sentencing Commission.[5] Id. In addition, the BOP "may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another." Id.

2.       **BOP Policy**

The BOP had a longstanding practice of transferring inmates, with some exceptions, to CCCs to serve the last six months of a sentence. See Goldings v. Winn, 383 F.3d 17, 19 & n.1 (1st Cir. 2004) (describing policy before 2002); Iacaboni v. United States, 251 F. Supp. 2d 1015, 1017 (D. Mass. 2003) ("[R]ecommendations to community confinement have been made in thousands of cases by hundreds of judges continuously since at least 1965, and in nearly all instances accepted by the BOP.") For some short sentences, this might mean that the entire sentence was

_____

[4]We set out the statute in full in the Appendix.

[5]See the Appendix for the precise factors. Throughout the opinion, we refer to the factors in § 3621(b)(1)-(5) as the "five factors."

-5-

served in community confinement, rather than in a prison or jail. Indeed, the BOP would sometimes place short-time convicts serving sentences longer than six months in CCCs for their entire sentences. See, e.g., Iacaboni, 251 F. Supp. 2d at 1019 (ten-month sentence with recommendation for community confinement that was initially adopted by BOP before policy change); Id. at 1020 (sentence of one year and one day; prisoner assigned to CCC on judge's recommendation before BOP policy change). In doing so, the BOP often relied on the recommendation of the sentencing judge. Id.; see also Monahan v. Winn, 276 F. Supp. 2d 196, 198 (D. Mass. 2003) (noting "long-established BOP policy and practice of adopting judicial recommendations to place nonviolent inmates in such facilities to serve short terms of imprisonment").

In December 2002, the Department of Justice's Office of Legal Counsel issued a memorandum deeming the practice "unlawful." See Goldings, 383 F.3d at 20. The BOP advised its officers that placement in CCCs would thenceforth be available only to inmates during the last ten percent of their sentences, however short, regardless of the sentencing judge's recommendation. Id.

The new policy ("the 2002 policy") was predicated on the interaction of § 3621(b) and another statute, § 3624(c), which provides:

> The Bureau of Prisons shall, to the extent
> practicable, assure that a prisoner serving a
> term of imprisonment spends a reasonable part,
> not to exceed six months, of the last 10 per

-6-

centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community.

18 U.S.C. § 3624(c). The 2002 policy was based on the argument that § 3624(c) marked the limits of the BOP's discretion to use CCCs as places of imprisonment, or, in the alternative, that CCCs were not penal or correctional facilities within the scope of § 3621(b) at all. See Goldings, 383 F.3d at 22-23.

The new policy was applied to prisoners already sentenced, including both those who had already been placed in a CCC under the old policy, those who had been sentenced and assigned but had not yet reported to begin serving their terms, and those who had been sentenced but not yet assigned. This upset the considered expectations not only the prisoners themselves, but of the judges who had sentenced them. Unsurprisingly, the 2002 policy "generated a flood of lawsuits in the federal district courts." Id. at 19.

We held in Goldings that the 2002 policy was contrary to the plain meaning of 18 U.S.C. § 3621(b). Id.; see also Elwood v. Jeter, 386 F.3d 842 (8th Cir. 2004) (adopting reasoning and conclusion of Goldings). We held the time limits in § 3624(c) did not cabin the discretion afforded to § 3621(b), but merely marked the limits of the time period for which the BOP had to "assure" "to the extent practicable" that conditions would be conducive to re-

entry.  We further held that CCCs were "correctional facilit[ies]" for the purposes of § 3621(b), and therefore the BOP could place prisoners in them.  Goldings, 383 F.3d at 28.

In 2005 the BOP promulgated regulations ("the 2005 regulations") providing its "categorical exercise of discretion for designating inmates to community confinement."[6]   28 C.F.R. § 570.20(a). The BOP maintained that it would assign inmates to community confinement "only as part of pre-release custody and programming, during the last ten percent of the prison sentence being served, not to exceed six months."  28 C.F.R. § 570.21(a).[7] Thus, the BOP has codified as a formal rule the substance of the 2002 policy, reaching the same result by relying on the opposite rationale:  instead of arguing, as previously, that it lacks discretion to make CCC placements before the last ten percent of a sentence, BOP now claims its discretion is broad enough to allow it to make a categorical rule preventing such placements.

## 3.        **Jurisdiction and Mootness**

We regard this case as properly before us, but we pause to address two possible obstacles to our review:  jurisdiction and mootness.

---

[6]The regulations, 28 C.F.R. §§ 570.20-21, are set out in the Appendix.

[7]Section 570.21(b) outlines some exceptions not relevant here.

First, jurisdiction is appropriate because a habeas petition seeking relief from the manner of execution of a sentence is properly brought under 28 U.S.C. § 2241. Rogers v. United States, 180 F.3d 349, 357 (1st Cir. 1999) (habeas petition under § 2241 appropriate vehicle for challenging failure to designate state prison as place for confinement); see also Levine, 455 F.3d at 78 (finding jurisdiction under § 2241 for habeas challenge to the same BOP regulations challenged here). But see Richmond v. Scibana, 387 F.3d 602, 605-06 (7th Cir. 2004) (challenge to the 2002 policy must be pursued as civil litigation under the APA, rather than in habeas under § 2241).[8]

Second, the issue is not moot. Petitioner Gonzalez has a predicted release date of August 31, 2008. According to the district court, he would have been eligible for CCC transfer on February 17, 2008 under the old policy, but has been informed that he will not be transferred to a CCC until March 18. Petitioner

---

[8]Under the holding of Richmond, prisoners in the Seventh Circuit are challenging the 2005 regulations as violative of the APA. See, e.g., Martins v. Fed. Bureau of Prisons, 2008 U.S. Dist. LEXIS 5022 (W.D. Wisc. Jan. 22, 2008); Belk v. Fed. Bureau of Prisons, 2008 U.S. Dist. LEXIS 5020 (W.D. Wisc. Jan. 22, 2008); Celozzi v. Fed. Bureau of Prisons, 2007 U.S. Dist. LEXIS 94227 (W.D. Wisc. Dec. 19, 2007); Smith v. Davis, 2006 U.S. Dist. LEXIS 77213 (S.D. Ill. Oct. 23, 2006).

Muniz's case is likely moot.[9]  But that in no way hinders our review because Gonzalez's case is clearly not moot.[10]

## 4.      Standard of Review

"When we are asked to review an agency's construction of a statute that it administers, we review that agency's interpretation de novo, subject to established principles of deference." Perez-Olivo v. Chavez, 394 F.3d 45, 48 (1st Cir. 2005) (citing Goldings, 383 F.3d at 21).  We afford no deference to the district court's grant or denial of habeas relief.  Healy v. Spencer, 453 F.3d 21, 25 (1st Cir. 2006), cert. denied, 127 S. Ct. 1489 (2007).

## 5.      Analysis

We must determine whether the 2005 regulations comport with the authority and obligations conveyed by section 3621(b).  To do so, we must answer two questions.  First:  Is the categorical exercise of discretion through rulemaking permissible in this context?  Second:  If so, does the substance of the 2005 regulations comport with statute's intent?  The first question requires us to apply the Supreme Court's decision in Lopez v.

---

[9]Petitioner Muniz had a projected release date of December 24, 2007.  The record shows he was considered for CCC placement under the old policy as directed by the district court.  If he has in fact been released, there is no meaningful relief to be granted to Appellant Carolyn Sabol, in her official capacity as warden.

[10]If this case were moot, we might nevertheless decide the issue as an appropriate exercise of advisory mandamus.  See In re United States, 426 F.3d 1, 5 (1st Cir. 2005).

<u>Davis</u>, 531 U.S. 230 (2001), and decide whether a clear expression of congressional intent forecloses categorical rulemaking. The second question invokes the <u>Chevron</u> doctrine of agency deference. The two-step <u>Chevron</u> analysis begins with the statute itself. If the regulations conflict with the statute, the regulations are invalid. <u>Chevron, U.S.A., Inc.</u> v. <u>NRDC, Inc.</u>, 467 U.S. 837, 843 n.9 (1984) ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."). If, however, we find the statute ambiguous, we afford significant deference to the agency's interpretation, and ask only "whether the agency's answer is based on a permissible construction of the statute." <u>Id.</u> at 843. Because the <u>Lopez</u> and <u>Chevron</u> inquiries are interrelated, we examine the statute only once, with both in mind. We begin with the plain language of the statute.

a.      The Statute

The plain language of the statute contains a grant of discretion and a command that the BOP consider the five factors when exercising that discretion. The BOP "shall designate the place of the prisoner's imprisonment." 18 U.S.C. § 3621(b). The BOP is provided the discretion to choose "any available penal or correctional facility that meets minimum standards of health and habitability . . . that the Bureau determines to be appropriate and

-11-

suitable, considering" the five factors.[11]   Id.   This is a broad

grant of discretion.  See Thye v. United States, 109 F.3d 127, 130

(2d Cir. 1997) ("Decisions to place a convicted defendant within a

particular treatment program or a particular facility are decisions

within the sole discretion of the Bureau of Prisons." (internal

quotation marks omitted)).  The statute allows that "[t]he Bureau

may, at any time, having regard for the same matters, direct the

transfer" to another facility.  Id.

The statute also contains a prohibition on "favoritism

given to prisoners of high social or economic status."  The

inclusion of one forbidden factor implies that other factors, not

among the five, might be considered.  If the five factors were

exclusive, the prohibition on favoritism would be unnecessary.  See

Levine, 455 F.3d at 82 n.6; Cohen v. United States, 151 F.3d 1338,

1343 (11th Cir. 1998) ("[Section 3621(b) gives] the BOP ample room

for judgment by listing a non-exhaustive set of factors for the BOP

to consider and leaving to the BOP what weight to assign to any

particular factor."); Thye, 109 F.3d at 130 (holding it "well

within Bureau's discretion" to consider alienage in placing

---

[11]Three of the factors ("the nature and circumstances of the
offense; . . . the history and characteristics of the prisoner;
[and] any statement by the court that imposed the sentence," 18
U.S.C. §§ 3621(b)(2)-(4)) do seem to require individualized
consideration.  In that much we agree with our sister circuits.
See Wedelstedt, 477 F.3d 1168; Levine, 455 F.3d at 85; Fults, 442
F.3d at 1091; Woodall, 432 F.3d at 247.  The nature of that
consideration is the crux of the matter.

inmate). The statute is silent on whether one of the five factors, or another factor not listed, may for some prisoners or for some facilities predominate over all others in importance.

Applying Lopez, we discern no clear expression of congressional intent to foreclose rulemaking. As an initial matter, the transfer provision in § 3621(b) leaves more to the BOP's discretion than the assignment provision. But moreover, even the assignment provision lacks a clear expression of congressional intent to forbid rulemaking that assists BOP in its individualized determinations.

The provision of § 3621(b) governing transfers, properly read, contains near-identical language to the provision the Supreme Court considered in Lopez. That case considered § 3621(e), which provides that the period of custody for some prisoners "may be reduced by the Bureau of Prisons."[12] § 3621(e)(2)(B). Lopez held that this represented a grant of discretion to the BOP, and that the BOP could prescribe additional requirements through notice-and-comment rulemaking. 531 U.S. at 241. In other words, "the Bureau thus has the authority, but not the duty" to reduce the sentence. Id. The transfer provision at issue in this case contains the same permissive language: "The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal

_____

[12]Specifically, those prisoners who successfully complete a residential substance abuse treatment program. 18 U.S.C. § 3621(e)(2).

-13-

or correctional facility to another." § 3621(b). We read this provision differently than our sister circuits. It appears to us that the phrase "having regard for the same matters" (i.e. the five factors) applies to any transfer that the Bureau may direct, but that the statute leaves it to the BOP's discretion whether to undertake a transfer at all.[13] See Woodall, 432 F.3d at 251 (Fuentes, J. dissenting) ("[T]he § 3621(b) factors need not be considered by the BOP until an inmate is actually considered for a transfer, and . . . the BOP is not required to consider any inmate for transfer to a CCC until the lesser of six months or ten percent of an inmate's sentence remains."); Yip v. Fed. Bureau of Prisons, 363 F. Supp. 2d 548, 552 (E.D.N.Y. 2005).[14] The matter does not end

---

[13]Compare the language governing initial assignments: "The [BOP] shall designate the place of . . . imprisonment. The [BOP] may designate any available penal or correctional facility . . . ." Because the mandatory "shall" requires that some place be designated, the permissive "may" in the second sentence only speaks to the range of possible choices and does not mean that the BOP could refuse to designate a facility altogether. In contrast, the language governing transfers simply states that the BOP "may . . . direct" the transfers.

[14]Fults explicitly comes to the opposite conclusion, but does not give a reason. "A BOP decision to not transfer an inmate--or, as in this case, a group of inmates--requires the same consideration of the § 3621(b) factors as does the decision to transfer an inmate to a CCC." 442 F.3d at 1092. With respect, we believe that the BOP's decision to transfer a prisoner to a specific facility is divided by the statute into two steps: First, the decision, entirely within the BOP's discretion, of whether to transfer the prisoner at all; second, once a transfer is under consideration, the decision which facility is the appropriate one. That second decision must be made "having regard for" the five factors. If this were not the case, if declining to authorize a transfer were covered by the mandatory "shall" in "shall assign," then the BOP

-14-

there, however.  According to our analysis, under <u>Lopez</u> even the assignment provision supports the rulemaking at issue here.

The plain language of the statute contains no explicit guidance on whether the BOP may facilitate assignments through categorical exercises of discretion.  Other courts have viewed the conjunctive list of the five factors and the mandatory nature of the language "shall designate . . . , considering" as foreclosing the possibility of a categorical exercise of discretion.  <u>See</u> <u>Wedelstedt</u>, 477 F.3d at 1165-66; <u>Levine</u>, 455 F.3d at 80-82; <u>Fults</u>, 442 F.3d at 1091-92; <u>Woodall</u>, 432 F.3d at 245-46.  We agree, to a point.  Congress certainly intended that the five factors be considered in the placement decision.  But we do not believe that this constitutes the clear expression of Congressional intent required by <u>Lopez</u> to foreclose all rulemaking whatsoever.  Even where a statute requires individualized determinations, "the decisionmaker has the authority to rely on rulemaking to resolve certain areas of general applicability unless Congress clearly expresses an intent to withhold that authority."  <u>Lopez</u>, 531 U.S. at 244 (internal quotation omitted).  The statute does require individualized determinations, but if that were sufficient to prevent rulemaking altogether, the statement in <u>Lopez</u> would be a paradox, because it implies that some statutes that require

would never be free to decline a transfer request without considering the five factors.  Congress surely did not intend such a result.

-15-

individualized determinations nonetheless permit rulemaking. Something more must be required of Congress, and we see no more here.

Because the plain language of the statute does not address "the precise question[s] at issue," we turn to the statute's legislative history to help resolve the ambiguity. We provide some context. Section 3621, enacted as part of the Sentencing Reform Act of 1984, replaced previous statutory language committing prisoners to the custody of the Attorney General and granting him discretion to choose the place of confinement. Pub. L. 98-473, 98 Stat. 2007-08; see also 18 U.S.C. §§ 4082(a)&(b)

(1984)[15], amended by Pub. L. 98-473, § 218(a)(3) (old statutory scheme).

The other circuits have found the plain language of the statute dispositive. Wedelstedt, 477 F.3d at 1166-67; Levine, 455 F.3d at 82; Fults, 442 F.3d at 1090; Woodall, 432 F.3d at 248-49. Consequently, they did not need to pursue other avenues of statutory construction such as legislative history. But each majority opinion does go on to examine the legislative history, a

---

[15]Prior to enactment of the Sentencing Reform Act of 1984, the statute read:

> (a) A person convicted of an offense against the United States shall be committed, for such term of imprisonment as the court may direct, to the custody of the Attorney General of the United States, who shall designate the place of confinement where the sentence shall be served.
> (b) The Attorney General may designate as a place of confinement any available, suitable, and appropriate institution or facility, whether maintained by the Federal Government or otherwise, and whether within or without the judicial district in which the person was convicted, and may at any time transfer a person from one place of confinement to another.

18 U.S.C. § 4082 (a)&(b) (1984). The structure of the earlier statute lends strength to our conclusion above that the discretion to order a transfer at all is not cabined by consideration of the factors. Viewing the old language, it is even more clear that the transfer language is separate from the mandate "shall designate" in subsection (a). While the discretionary "may designate" in subsection (b) is clearly constrained by the requirement "shall designate" in subsection (a), there is no reason to read the transfer-or-no-transfer decision as anything but discretionary. Nor is there any indication from the legislative history discussed below that Congress intended to change the scope of this discretion when it changed the statute.

-17-

practice this circuit often follows as well.  See Succar v. Ashcroft, 394 F.3d 8,  31 (1st Cir. 2005) (approving consideration of legislative history as a check on interpretation of statutory language).  Each opinion cites the same snippet of the legislative history, either directly or by citing one of the other opinions: a part of the Senate Judiciary Committee report that was included with the bill when it was enacted.  See Levine, 455 F.3d at 82 (quoting and citing S. Rep. No 98-225, reprinted in 1984 U.S.C.C.A.N. 3182, 3324-25); Woodall, 432 F.3d at 245-46 (same); see also Wedelstedt, 477 F.3d at 1166 n.7 (citing Levine and Woodall for the proposition that the legislative history supports the invalidity of the 2005 regulations); Fults, 442 F.3d at 1092 (finding its view of the plain language "bolstered by the statute's legislative history as discussed in Woodall.").  We set out the relevant portion of the report in full in the Appendix.

We find this passage to be ambiguous when viewed in the light of our construction of the statute's plain language.  The passage states that the bill "follows existing law" with regard to assignments and transfers.  S. Rep. No. 98-225, at 141-42 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3324-25.  The report does say that "in determining the availability or suitability of the facility selected, the Bureau is specifically required to consider such factors" as the five factors.  Id.  But even this command is tempered; the report goes on to say that "by listing factors . . .

-18-

[the committee] does not intend to restrict or limit the Bureau in the exercise of its existing discretion."

This legislative history just as easily supports our reading of the statute.[16] Nothing in this passage requires consideration of the five factors for every facility or type of facility that is <u>ruled out</u>. Nor is there a clear expression of intent to withhold the authority to make rules of general applicability. In any event, we find the legislative history sufficiently ambiguous that we proceed to <u>Chevron</u>'s second step.

> b.    Are the 2005 Regulations a Reasonable Interpretation of § 3621(b)?

Finding that Congress did not address whether the BOP could make a categorical exclusion of one type of facility from its placement decisions, we ask, under the second step of the <u>Chevron</u> analysis, whether the 2005 regulations are a reasonable interpretation of the statute. 467 U.S. at 844; <u>see also</u> <u>id.</u> at 843 ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

The 2005 regulations are a reasonable interpretation of the mandate delivered to the BOP by Congress: Congress has instructed the BOP to place each prisoner in an appropriate

---

[16]We note that it is a symptom of the general weakness of legislative history as a clue to legislative intent that even this small piece of a Senate report seems to shift meaning depending on the light in which it is viewed.

-19-

facility, considering the five factors. In carrying out that responsibility, the BOP has made the reasonable determination that some facilities are simply categorically inappropriate for prisoners during the first ninety percent of their sentences or for periods of longer than six months. Neither the substance of that decision, nor the method the BOP used to codify the decision represents an unreasonable interpretation of § 3621(b).

The concurring opinion in Goldings predicted that "[e]ven if the statutory criteria for making assignments and transfers could be read to guarantee some sort of individualized treatment . . . BOP would still have the authority to make a categorical rule excluding some or all CCC placements, except as required for end of sentence placements governed by § 3624(c)." Goldings, 383 F.3d at 33 (Howard, J., concurring). The concurrence relied on Lopez, quoting a passage we have already mentioned:

> "Even if a statutory scheme requires individualized determinations . . . the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." [Lopez, 531 U.S. at 243-44] (quoting American Hosp. Ass'n v. NLRB, 499 U.S. 606, 612, 113 L. Ed. 2d 675, 111 S. Ct. 15395 (1991)). BOP "is not required continually to revisit 'issues that may be established fairly and efficiently in a single rulemaking proceeding.'" Id. (quoting Heckler v. Campbell, 461 U.S. 458, 467, 76 L. Ed. 2d 66, 103 S. Ct. 1952 (1983)).

-20-

Goldings, 383 F.3d at 33 (Howard, J., concurring).  The first question is whether this statement in Lopez applies.  It does.

On the one hand, Lopez is particularly instructive because it treats the authority of the same agency, the BOP, to promulgate regulations under another part of the same statutory scheme, § 3621(e).  On the other hand, that part of the statute lists no factors for consideration.  The other circuits to have considered the question find Lopez inapplicable to § 3621(b); they reason that § 3621(b) is different because inclusion of the factors as a conjunctive list demonstrates clear congressional intent that all of the factors be considered.  Wedelstedt, 477 F.3d 1160, 1167-68;  Levine, 455 F.3d at 85; Fults, 442 F.3d at 1091; Woodall, 432 F.3d at 246-47.  As previously discussed, we do not think this is the sort of clear expression of intent required.

The second question is whether the substance of the 2005 regulations is an acceptable implementation of the governing statute.  It is.  Two facts compel us to that conclusion.

First, the decision with which the BOP is charged in the statute is not the one being made by the 2005 regulations.  If § 3621(b) were directed solely at the determination of whether a CCC or a traditional prison facility was the right type of facility, we might come to a different result.  But § 3621 requires BOP to consider the five factors in a much broader context:  deciding what specific facility is the right one to house each prisoner.  The

question whether a CCC is an appropriate facility for any prisoner during the first ninety percent of a term is a subset of that question, and deciding it on a categorical basis is not the same as deciding the final issue of placement on a categorical basis.[17] This, then, is nothing more than a background rule of general applicability, promulgated in the interest of efficiency and uniformity, that serves to focus the individualized consideration Congress required. This is precisely what Lopez envisioned. "The Bureau is not required continually to revisit 'issues that may be established fairly and efficiently in a single rulemaking proceeding.'" Lopez, 531 U.S. at 244 (quoting Heckler, 461 U.S. at 467).

Second, the 2005 regulations were promulgated with explicit reference to some of the five factors. See Community Confinement, Proposed Rule, 69 Fed. Reg. at 51,214 (discussing facility resources and policy statements of the Sentencing Commission). The proposed rule also expressly relied on the importance of deterring future crime, which is one of the stated goals of sentencing, as well as § 3621(b)'s prohibition on treating inmates differently based on wealth or social status. Id. at 51,214-15. Under the statute, other factors may be considered and

---

[17]We emphasize that were the regulations to leave little or no room for the operation of the individualized assessment implied by Congress, we would regard that as contrary to intent of the statute.

may even be dispositive. "When experience or common sense shows that the housing decision will be the same no matter what the evidence regarding a particular factor, the BOP need not go through the motions of collecting the evidence and noting that the one factor cannot outweigh the others in the particular circumstance." Wedelstedt, 477 F.3d at 1171 (Hartz, J., dissenting); see also Levine, 455 F.3d 71 at 91 (Raggi, J., dissenting) ("The BOP might reasonably conclude, as it implicitly did here, that, regardless of an individual prisoner's offense, history, and personal characteristics, or any statement made by a sentencing judge, other factors . . . combine to warrant a categorical rule excluding CCC facilities from consideration in general § 3621(b) designations.") If Congress had limited consideration to only these five factors, or had laid out how the factors ought to be balanced, we would face a different question. Pragmatically, we cannot imagine that Congress intended by its silence to make pointless work for the BOP.

We note also that the BOP has other policies that deny CCC placement in other circumstances. See Federal Bureau of Prisons, Program Statement 7310.04, Community Corrections Center (CCC) Utilization and Transfer Procedure at 10 (Dec. 16, 1998), available at http://bop.gov/DataSource/execute/dsPolicyLoc (last visited Feb. 20, 2008). Those policies restrict the transfer of inmates who are assigned a "Sex Offender" or "Deportable Alien"

"Public Safety Factor" or "who require inpatient medical, psychological, or psychiatric treatment," among others.[18]  Id. These policies are entitled to less deference under Chevron, because they are merely interpretive rules and were not promulgated under the APA's notice-and-comment provisions.  But they have nevertheless been upheld.  See Fox v. Lappin, 409 F. Supp. 2d 79, 92 (D. Mass 2006) (upholding policy of denying transfer to CCC to those with "Sex Offender" Public Safety Factor).  We believe this is in accordance with the BOP's ability to make rules of general applicability that guide its decisions.

Stepping back, we recognize that the dispute is in part over the BOP's substantive decision to restrict CCC availability. Assuming the decision itself is not contrary to the wishes of Congress, the BOP will one way or the other be able to carry it out.[19]  The 2005 regulations at least have the advantage of transparency.  There is no dispute that, as long as the BOP "considers" the five factors, it has virtually unlimited discretion to place inmates wherever it deems appropriate.  The BOP could simply consider the five factors in each case but decide, in each case, not to place each inmate in a CCC.  At the very least, the

---

[18]These policies say that such prisoners are not "ordinarily" eligible for CCC placement.  This might appear to provide exceptions that are ostensibly lacking in the 2005 regulations. But this does not change our analysis.

[19]Of course, if the decision to restrict CCC placements is unacceptable to Congress, it can easily rectify the discrepancy.

2005 regulations have the advantage of being consistent, formal rules of general applicability that can be attacked under the APA for the circumstances of their promulgation and can be discussed as matters of public policy in the elected branches. Similarly, even courts striking down the 2005 regulations seem to acknowledge that the BOP could close the CCCs entirely. See Levine, 455 F.3d at 82. That such a result would frustrate petitioners' desires is obvious.

Our holding is a narrow one of statutory interpretation. We emphasize that we express no opinion about the validity of the 2005 regulations under the APA. Neither do we pass any judgment on the wisdom of the decision to limit CCC placements. We recognize that sentencing discretion is crucial to district court judges, and urge and expect the BOP to be sensitive to this in its policymaking.

Because the individualized consideration of the five factors mandated by 18 U.S.C. § 3621(b) is directed at the overall placement decision, and because the question of the appropriateness of CCCs for inmates during the first ninety percent of their sentences is an issue of general applicability within the scope of Lopez, the 2005 regulations are a reasonable exercise of the Bureau of Prisons' discretion in carrying out its duties under 18 U.S.C. § 3621(b). The plain language and legislative history are silent on whether such a policy would contradict the statute, and the

BOP's construction of its duties here is reasonable.  The decision below is **reversed**.

**APPENDIX**

**18 U.S.C. § 3621 Imprisonment of a convicted person, Subsection (b)**

(b) Place of imprisonment.  The Bureau of Prisons shall designate the place of the prisoner's imprisonment.  The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering--

   (1) the resources of the facility contemplated;

   (2) the nature and circumstances of the offense;

   (3) the history and characteristics of the prisoner;

   (4) any statement by the court that imposed the sentence--

      (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or

      (B) recommending a type of penal or correctional facility as appropriate; and

   (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having

regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another.  The Bureau shall make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse.

**28 C.F.R. §§ 570.20-21**

§ 570.20 What is the purpose of this subpart?

(a) This subpart provides the Bureau of Prisons' (Bureau) categorical exercise of discretion for designating inmates to community confinement.  The Bureau designates inmates to community confinement only as part of pre-release custody and programming which will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry into the community.

(b) As discussed in this subpart, the term "community confinement" includes Community Corrections Centers (CCC) (also known as "halfway houses") and home confinement.

§ 570.21 When will the Bureau designate inmates to community confinement?

(a) The Bureau will designate inmates to community confinement only as part of pre-release custody and programming, during the last ten percent of the prison sentence being served, not to exceed six months.

(b) We may exceed these time-frames only when specific Bureau programs allow greater periods of community confinement, as provided by separate statutory authority (for example, residential substance abuse treatment program (18 U.S.C. 3621(e)(2)(A)), or shock incarceration program (18 U.S.C. 4046(c)).

**S. Rep 98-225, at 141-21:**

SECTION 3621. IMPRISONMENT OF A CONVICTED PERSON

This section is derived from existing law.

Proposed 18 U.S.C. 3621(a) is derived from 18 U.S.C. 4082(a) except that the new provision places custody of federal prisoners directly in the Bureau of Prisons rather than in the Attorney General. This change is not intended to affect the authority of the Bureau of Prisons with regard to such matters as place of confinement of prisoners, transfers of prisoners, and correctional programs, but is designed only to simplify the administration of the prison system. Direct custody of prisoners will be in the Bureau of Prisons, but the Director of the Bureau of Prisons will remain subject to appointment by the Attorney General and subject to his direction. In addition, it is made clear that the custody of the Bureau of Prisons continues until the expiration of the term of imprisonment, or until release at the expiration of

that term less any time credited toward service of sentence pursuant to section 3624(b).

Proposed 18 U.S.C. 3621 (b) follows existing law in providing that the authority to designate the place of confinement for federal prisoners rests in the Bureau of Prisons. The designated penal or correctional facility need not be in the judicial district in which the prisoner was convicted and need not be maintained by the federal government. Existing law provides that the Bureau may designate a place of confinement that is available, appropriate, and suitable. Section 3621(b) continues that discretionary authority with a new requirement that the facility meet minimum standards of health and habitability established by the Bureau of Prisons. In determining the availability or suitability of the facility selected, the Bureau is specifically required to consider such factors as the resources of the facility considered, the nature and circumstances of the offense, the history and characteristics of the prisoner, the statements made by the sentencing court concerning the purposes for imprisonment in a particular case, any recommendations as to type of facility made by the court, and any pertinent policy statements issued by the Sentencing Commission pursuant to proposed 28 U.S.C.994(a)(2). After considering these factors, the Bureau of Prisons may designate the place of imprisonment in an appropriate

type of facility, or may transfer the offender to another appropriate facility.

In the absence of unusual circumstances, federal courts currently will not review a decision as to the place of confinement. The committee, by listing factors for the Bureau to consider in determining the appropriateness or suitability of any available facility, does not intend to restrict or limit the Bureau in the exercise of its existing discretion so long as the facility meets the minimum standards of health and habitability of the Bureau, but intends simple to set forth the appropriate factors that the Bureau should consider in making the designations.